FIFTH DIVISION
March 31, 2011

No. 1-10-1452

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *IN RE* THE MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JAMES A. ANDERSON | ) | Cook County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| | ) | No. 99 D 06640 |
| and | ) | |
| | ) | |
| PATRICIA M. ANDERSON, | ) | The Honorable |
| | ) | Raul Vega, |
| Respondent-Appellant. | ) | Judge Presiding. |
| | ) | |
| | ) | |
| | ) | |

_____

JUSTICE JOSEPH GORDON delivered the judgment of the court, with opinion.
Justices Smith and Howse concurred in the judgment and opinion.

**OPINION**

Respondent Patricia Anderson appeals from an order from the circuit court of Cook County terminating her maintenance and denying her petition for rule to show cause for indirect civil contempt. Respondent contends that the trial court erred in terminating her maintenance because petitioner James Anderson failed to establish the existence of a substantial change and that, in any event, petitioner has sufficient income and assets to continue to pay maintenance to

respondent, while respondent is financially dependent. In addition, respondent contends that the court erred in not finding petitioner in contempt for his noncompliance with the court's previous order denying petitioner's motion to modify maintenance. While the trial court properly found that petitioner showed a substantial change in circumstances since the entry of the previous order on maintenance, it erred in taking into account respondent's eligibility for public assistance when determining whether maintenance should be terminated.

BACKGROUND

Respondent and petitioner were married on February 3, 1951. On November 4, 1988, a judgment of dissolution of marriage, which incorporated a marital settlement agreement, was entered by the superior court of the State of California, County of San Diego, and on June 1, 1992, that judgment was enrolled in the circuit court of Cook County. At the time the judgment was entered, the parties had been married for 37 years and had no minor children. Also at that time, petitioner was self-employed in sales and expected to a net income of $105,000 for the year of 1988. Respondent was unemployed and had no income from wages or business.

Pursuant to the judgment, petitioner was awarded a vacation home located in Minoqua, Wisconsin, one half of the proceeds from the sale of the marital home located in San Diego, California and six individual retirement accounts (IRAs) held in his name. Respondent was awarded one-half of the proceeds from the marital home, four IRAs held in her name, Southwestern Bell bonds, and an equalization payment in the amount of $8,483 to be paid from petitioner's share of the proceeds from the marital home. In addition, the judgment awarded an equal division of petitioner's retirement account from McGraw-Hill Publishers pursuant to a

qualified domestic relations order. Lastly, respondent was awarded spousal support in the sum of $3,000 per month continuing "until the death of either party, the remarriage of the wife, or further court order."

In early 1992, petitioner sought to modify his maintenance payments to respondent, and although the record does not contain the disposition on that matter, the parties agree that in 1992 the superior court of California reduced respondent's spousal support to $950 per month. On April 28, 1999, respondent filed a petition in the circuit court of Cook County for rule to show cause against petitioner for his failure to make spousal support payments to respondent in accordance with the modified order from the superior court of California in 1992, and for failure to pay respondent her share of the McGraw-Hill retirement benefits. On July 22, 1999, petitioner filed a petition in the circuit court of Cook County to further modify maintenance, in which he sought termination of his maintenance obligations and attested that since the entry of the order from the superior court of California, there had been a material change in his circumstances such that he was financially unable to meet that obligation. In support of that contention, petitioner stated that he was 70 years of age at that time and that his income declined when he retired in 1994. At that time, petitioner's son took over his sales accounts and paid petitioner a monthly stipend of $1,000. Petitioner contends that in 1997 his income was further reduced when his son was involuntarily terminated from petitioner's business and could no longer pay that stipend. Petitioner's asset disclosure statement, which was disclosed in connection with those proceedings, revealed a gross income of $36,000 for 1998, and $15,000 through May 1999.

On August 26, 1999, respondent filed her own petition in which she sought to increase her

maintenance award and averred that since the entry of the order from the superior court of California, her monthly expenses had significantly increased and she had insufficient income to defray her basic living expenses. Respondent stated that she was 72 years of age at that time and that her only sources of income were her social security benefits and interest income, which amounted to $700 per month. On October 12, 1999, the circuit court of Cook County entered an order denying both petitioner's and respondent's petitions for modification and ordering petitioner to recommence his monthly payments to respondent in the amount of $950.

On October 1, 2004, respondent filed a "petition for entry of [a] withholding order or in the alternative automatic withdrawal from [petitioner's] checking account for payment of monthly maintenance obligation." Subsequently, on December 28, 2004, the trial court entered an amended agreed order, which provided that petitioner's maintenance payments would be made directly from his Morgan Stanley account by the fifth day of each month.

On December 31, 2008, petitioner filed a motion to terminate respondent's right to receive maintenance, in which he attested that since the entry of the trial court's order on October 12, 1999, he had "lost a great deal of his retirement savings in the Stock Market Decline during the year 2008," and that his health issues and advanced age prevented him from working. He further attested that his only sources of income were a small annuity and his social security benefits. On August 21, 2009, respondent filed a new petition for rule to show cause for indirect contempt against petitioner in which she alleged that she had not received any maintenance payments since January, 2009.

A hearing on petitioner's motion to terminate respondent's maintenance and respondent's

petition for rule to show cause was held on December 16, 2009. At that hearing, petitioner testified that he was 80 years old and unemployed, and that, due to his health-related issues, he was unable to go back to work. He acknowledged that he was already unemployed in 1999, when the court entered its prior order denying his petition to modify maintenance. Petitioner further testified that he retired in 1994, and that at time, his son took over his business in selling advertising and magazines. According to petitioner, he received a stipend of $1,000 per month from his son from the time he retired until 1996, at which time his son was involuntarily terminated from petitioner's business and could no longer make those payments. Petitioner averred that as of the time of that hearing, his sources of income consisted only of draws from his Morgan Stanley account in the amount of $1,600 per month, a "retirement check" from McGraw-Hill for $134 per month and social security benefits in the amount of $1,600 per month. According to petitioner, he withdraws $2,000 per month from his Morgan Stanley account, leaving him with $1,600 after taxes. Petitioner admitted that his social security benefits have increased from $1,200 in 1999. Petitioner also acknowledged that his current wife receives $400 per month from a Teamster's pension and $300 per month in social security benefits, which is used for her own personal expenses and for the couple's discretionary spending, such as gifts for children and grandchildren. In addition, petitioner testified that he has a whole life insurance policy worth $7,000 to cover the cost of his burial. According to petitioner, his life-style has "gone down," that he no longer belongs to clubs, does no "extra spending," and is "just paying the bills on the Wisconsin house and the Illinois house. He acknowledged, however, that he made charity donations of $110 a month in 2008.

Petitioner testified that when he filed a petition to modify maintenance in 1999, his Morgan Stanley retirement account was worth between $200,000 and $225,000. According to petitioner, as of May 2009, the value of that account had decreased to $77,500, and that on the date of the hearing, his retirement account was worth $63,000. In support of that assertion, petitioner introduced into evidence a monthly summary of his Morgan Stanley retirement account from January 2008, through May 2009. That summary shows that the value of that account was $158,403.52 in January, 2008, and $77,503.09 in May, 2009. It is also apparent from the summary that the "change in value" of the account was negative for 13 of the 17 months reported, which shows a decline in value that was not due to cash withdrawals. The cash withdrawals reported in the summary remained constant throughout most of that period, at $3,700 during most months, with an increase from November 2008 to January 2009, and a decrease to $2,190 afterwards. Petitioner further testified that when the market declined in 2008, he removed the remaining funds in his retirement account from the "market" and invested them in cash and government securities. Petitioner acknowledged that in January 2009, he instructed Morgan Stanley to cease withdrawing the $950 monthly payment for respondent. Petitioner averred that the remaining funds in his retirement account will last for approximately two years, at which point, he stated, "I hope I'm dead," because he will have no source of income than social security benefits.

In addition, respondent introduced into evidence petitioner's asset disclosure statements, which show that petitioner's income was $36,000 in 1998, $15,000 from January through May 1999, $42,792 in 2007 and $43,000 in 2008. In addition, petitioner's income tax returns for 2007

and 2008 show that the joint adjusted income of petitioner and his current wife was $58,755 in 2007, and $68,251 in 2008. According to petitioner, his portion of the income shown in his joint income tax returns attributable to him consists of his social security benefits and withdrawals from his Morgan Stanley account. Further, petitioner testified that he had not done his taxes for the year 2009 at the time of the hearing, but averred that his financial support consists of the $1,600 monthly withdrawal from his retirement account, the $134 monthly check from his McGraw-Hill retirement fund and $1,600 monthly payment in social security benefits.

Petitioner further testified that he currently owns a residence in Chillicothe, Illinois, which he believed to have a resale value of $80,000, but averred that a similar home in the same general location was valued at $69,500. However, respondent introduced into evidence an appraisal report obtained in 2008 when he sought to refinance the home, which purported to value the residence at $170,000 as of April 8, 2008. According to petitioner, the mortgage on that residence is $32,500, and his monthly payments on that mortgage is $318.

Additionally, petitioner testified that he continues to own the home in Minocqua, Wisconsin, which was awarded to him pursuant to the divorce judgment in 1988, and that he pays approximately $3,300 per year in property taxes on the home. Petitioner believes that the home is currently worth approximately $200,000, and acknowledged that it was valued at $365,124 by the tax assessor's office in 2008, before the market declined. Correspondingly, respondent introduced into evidence a document titled "Vilas County Tax Data" which showed

the fair value of petitioner's Wisconsin home as $365,124 in 2008.[1] According to petitioner, he had no intentions of selling either one of the two residences and intends to leave the home in Wisconsin for his children.

Respondent testified that her only investment asset is an account held with Chase Bank and that she also has a checking account at that bank. While respondent acknowledged that her Chase investment account was worth $91,999.42 as of May 31, 2009, she testified that as of the date of the hearing, that account was valued at around $70,000 to $75,000, and that her checking account had a balance of $3,454. Respondent further testified that she receives $754 per month in social security benefits, which is deposited directly into her checking account. In regard to respondent's available funds, petitioner introduced into evidence respondent's Chase account statements, which show an ending balance of $73,593.51 at the end of September, 2009.

Respondent also testified that she resides in an assisted living facility in Algonquin, Illinois, and pays monthly fees in the amount of $2,000 directly from her account. Respondent stated that had been previously living in another assisted living facility where she had been paying $4,000 per month, but has moved into a less expensive facility. Respondent currently draws about $2,700 per month from her accounts to pay for her housing and other expenses. Respondent also testified that she has been told that the state will pay for her living expenses at the facility where she currently resides after the funds in her Chase investment account are depleted. Further, respondent testified that once she no longer has funds in her Chase account, her social security

---

[1]While petitioner claims in his brief that his Wisconsin property was appraised at $170,000, the record indicates that the only property appraised at that value was petitioner's Illinois property.

benefits will be her only source of income to pay for her medications, personal expenses and expenses.

In addition, respondent introduced into evidence documentation of her credit card debt in the amount of $35,063, past-due medical obligations amounting to $3,916, and past-due fees owed to her former assisted living facility, which amounted to $13,350. Respondent also testified that she receives letters from creditors, one of which got a judgment against her and garnished her Chase accounts. In addition, respondent explained that due to her poor credit, she is unable to obtain another credit card and must pay for her expenses with cash. According to respondent, she has not been making payments to her creditors. She did not remember the last time she made a payment to one of them.

On April 30, 2010, the trial court entered an order granting petitioner's motion to terminate respondent's maintenance payments retroactive to January 2009, and denying respondent's petition for rule to show cause why petitioner should not be cited for civil contempt. In support of its order, the trial court found that "[p]etitioner has suffered a substantial change in his financial ability to continue to pay respondent any further maintenance; petitioner's investment accounts have lost substantial value." Further, the trial court stated that in 1999, petitioner had between $200,000 and $225,000 in his retirement account, which has since been depleted to $90,000 in January 2009, then to $63,000 at the time of the hearing. The trial court also noted that he has no additional source of income other than $1,600 per month from his Morgan Stanley account and $1,600 from social security income, and that he will use the remaining $63,000 in his retirement account in the next two years for his expenses. Further, the court noted that although

petitioner has remarried, his wife receives a minimal retirement income totaling $700 per month.

In arriving at its ruling, the trial court acknowledged that petitioner owns a residence in Illinois, which he claims to be worth $80,000 but was appraised at $170,000, and that he pays $318 per month on the mortgage on the residence. The trial court also acknowledged that petitioner owns a second home in Wisconsin, which he values at $200,000, although the home was assessed with a fair market value of $365,000. Further, the trial court noted that petitioner pays $3,300 in real estate taxes for the Wisconsin property and that he does not plan on selling either of his two homes.

With regard to respondent, the trial court stated that she had approximately $92,000 in a Chase account as of June 2009, and that she currently lives in a nursing home where the cost has gone down from $4,000 to $2,000 per month. The trial court also noted that when respondent's funds are depleted, "the State of Illinois will subsidize the cost of the facility." In addition, the trial court stated that respondent receives approximately $755 per month in social security income and draws $2,700 from her Chase account each month. The trial court then stated that "[w]hile petitioner must pay a mortgage on his Illinois home, taxes and insurance on two homes, respondent has the potential for free housing paid by the State."

ANALYSIS

I. The trial court's finding of a substantial change in circumstances

On appeal from that order, respondent first contends that the trial court erred in granting petitioner's motion to terminate her maintenance because he failed to establish the existence of a substantial change in circumstances since the entry of the prior order on October 12, 1999, which

No. 1-10-1452

denied his petition to reduce maintenance. Respondent argues that petitioner has not presented evidence that his health has substantially changed since 1999, and also that his income has actually increased since that time. In support of her contention, respondent notes that in his asset disclosure statement, petitioner reported an income of $36,000 in 1998 and $15,000 through May of 1999, which put him on track to earn approximately the same amount in 1999. Respondent further notes that petitioner's income tax returns for 2007 and 2008 show petitioner and his wife's joint gross income as $58,755 and $68,251, respectively. In addition, respondent maintains that petitioner failed to present evidence as to the value of his Morgan Stanley account when the previous order was entered in 1999; nor did he clarify whether the decrease in the balance of that account was due to the market's decline or to petitioner's own withdrawals. She also notes that while petitioner has stopped making maintenance payments to respondent, he has continued to withdraw the same amount for himself, namely, $1,600 per month.

Under section 510(a-5) of the Illinois Marriage and Dissolution of Marriage Act, "[a]n order of maintenance may be modified or terminated only upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a-5) (West 2008). Courts in Illinois have held that "substantial change in circumstances" as required under section 510 of the Act means that either the needs of the spouse receiving maintenance or the ability of the other spouse to pay that maintenance has changed. *In re Marriage of Neuman*, 295 Ill. App. 3d 212, 214, 693 N.E.2d 876, 878 (1998). The party seeking modification of a maintenance order has the burden of showing that a substantial change in circumstances has occurred. *In re Marriage of Logston*, 103 Ill. 2d 266, 287, 469 N.E.2d 167, 176 (1984). Additionally, where a modification has been

-11-

sought more than once, the trial court is to consider only the facts that occurred since the last modification hearing and to alter the award only upon showing of a substantial change in circumstances since that date. *In re Marriage of Connors*, 303 Ill. App. 3d 219, 226, 707 N.E.2d 275, 281 (1999). In *Connors*, 303 Ill. App. 3d at 226, 707 N.E.2d at 281, the court found that in a modification proceeding, parties are allowed to present only evidence which goes back to the latest petition for modification to avoid relitigating matters already settled, noting that a maintenance award is *res judicata* to the facts at the time the award was entered.)

A trial court's decision to modify maintenance will not be disturbed absent a clear abuse of discretion. *Blum v. Koster*, 235 Ill. 2d 21, 36, 919 N.E.2d 333, 342 (2009). A clear abuse of discretion takes place when " 'the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *Blum*, 235 Ill. 2d at 36, 919 N.E.2d at 342 (quoting *People v. Hall*, 195 Ill. 2d 1, 20, 743 N.E.2d 126, 138 (2000)). In addition, it is well established that the credibility of the witnesses and weight to be given to their testimony is for the trier of fact to decide, and a reviewing court may not substitute its judgment for that of the fact finder. *In re Marriage of Gordon*, 233 Ill. App. 3d 617, 657-58, 599 N.E.2d 1151, 1178 (1992). Further, a property owner is qualified to express his opinion of the value of his property by virtue of ownership. *American National Bank & Trust Co. v. City of North Chicago*, 155 Ill. App. 3d 970, 973, 508 N.E.2d 1111, 1113 (1987).

In this case, petitioner's testimony indicates that since 1999, his Morgan Stanley account has decreased in value from between $200,000 and $225,000 to $63,000 due to the market decline in 2008. He also presented a monthly summary showing that from January 2008 to May

2009, the value of that account decreased from $158,403.52 to $77,503.09. Although he did not present additional evidence of the value of his retirement account as of the date of the previous order, entered in 1999, his testimony that it was worth between $200,000 and $225,000 was not contradicted and was not inherently improbable, considering that in January 2008, that account was valued at $158,403.52. See *American National Bank*, 155 Ill. App. 3d at 973, 508 N.E.2d at 1113 . In addition, there is no credence to respondent's claim that no extrinsic proof was presented to show whether the decrease in petitioner's account was due to the market decline or whether it was due to his withdrawals. The monthly summary shows that from January 2008 through May 2009, that account suffered a substantial decline in its value during that period. It is commonly known that during that period, the United States was suffering from economic recession, while the amount of cash taken withdrawn by petitioner, as shown in the monthly summary, was consistent with petitioner's testimony as to the amount that he ordinarily withdrew for himself and for maintenance payments prior to December 2008.

Additionally, although petitioner's gross income reported in his income tax returns for 2007 and 2008 appear higher than his income shown in his asset disclosure statements for 1998 through May 1999, that does not indicate that petitioner's ability to pay maintenance has increased correspondingly as respondent suggests. Petitioner's uncontradicted testimony indicates that his income reported in those returns consists of withdrawals from his Morgan Stanley account and social security benefits. While his social security benefits have increased by $400 a month since 1999, the rest of his income consists mostly of withdrawals from his retirement funds, which are being depleted as he makes those withdrawals and according to

petitioner, will last only for two years from the time of the hearing. In addition, the gross income reported in those tax returns consisted of the joint gross income of petitioner and his wife, before deducting the maintenance paid by petitioner during those years. In contrast, it appears that the income shown in petitioner's asset disclosure statement for 1998 through May 1999 was calculated after making respondent's maintenance payment.

Furthermore, while it appears that petitioner is still withdrawing the same amount from his Morgan Stanley account for himself as he did in 1999, he testified that because of the losses that he suffered during the market decline, his funds would last only two years after the date of the hearing. He also testified that his lifestyle has declined insofar as he no longer belongs to clubs or has "extra spending," and that he now just pays the bills in connection with his homes. Thus, although petitioner has not decreased the amount of his monthly withdrawals from the Morgan Stanley account, that does not contradict his assertion that he is no longer able to afford maintenance payments to respondent because of the losses that he incurred during 2008.

Respondent further argues that any decrease in petitioner's account due to the market decline is temporary and does not amount to a substantial change in his circumstances. In support of that contention, respondent maintains that if the decline in the value of petitioner's Morgan Stanley account was due to the market decline, it is possible that petitioner will recover his losses, and she relies on *In re the Marriage of Dunseth*, 260 Ill. App. 3d 816, 827, 633 N.E.2d 82, 91 (1994). However, respondent's contention cannot prevail, and this case is distinguishable from *Dunseth*. In *Dunseth*, 260 Ill. App. 3d at 821, 633 N.E.2d at 87, the payor spouse filed a petition to modify his maintenance order when the amount collected from his medical practice in

December 1991 decreased from and average of $40,000 to $20,000. The trial court again denied the petition and found that he had a "bad month," which did not amount to a substantial change in circumstances. *Dunseth*, 260 Ill. App. 3d at 823, 633 N.E.2d at 88-89. That payor spouse filed a second petition when his income in March and April was about $25,000 due to IRS levies, a decrease in the number of surgeries he performed and suspension of surgical privileges. *Dunseth*, 260 Ill. App. 3d at 823, 633 N.E.2d at 89. The trial court denied that petition because his income was not lower than it was at the time of the previous order, and his maintenance payments were less than 8% of that income. *Dunseth*, 260 Ill. App. 3d at 824, 633 N.E.2d at 89. In affirming that order, the reviewing court found that when a maintenance payor's income fluctuates, a temporary decline does not always require modification. *Dunseth*, 260 Ill. App. 3d at 827, 633 N.E.2d at 91.

In contrast, petitioner in this case showed that over the course of 10 years, the value of his retirement account, which is one of his main sources of income, decreased from over $200,000 in 1999 to $63,000 in 2009. Unlike the facts in *Dunseth*, the record here does not indicate that petitioner's source of income merely "dipped" or decreased temporarily due to the payment of special costs or temporary circumstances. Moreover, petitioner testified that he has removed his money from the market and invested it in cash and government securities, and is therefore unlikely to benefit from a potential market recovery, even if and when such a recovery may come about. Thus, the record supports the inference that the decrease in petitioner's ability to make maintenance payments was not temporary and that the trial court did not abuse its discretion in finding that he showed a substantial change in circumstances warranting termination of his

maintenance obligation.

Respondent nevertheless maintains that petitioner did not show a substantial change in circumstances merely because of the change in the value of his retirement account. Respondent contends that petitioner had sufficient assets other than his retirement account and his total income increased since 1999. Respondent also contends that the change in value of his retirement account was foreseeable as of the entry of the judgment order in 1999 and, therefore, cannot be characterized as a substantial change in circumstances. However, respondent's contention lacks merit.

An argument can be made that if certain changes or fluctuations are normal or cyclical a maintenance award may take those changes into account in calculating the award. However, it does not necessarily follow that the trial court would have taken into account the possibility of a precipitous drop in the value of a former spouse's source of income. Moreover, in assessing its award, the trial court may consider the present value of an account by looking at its past history, and it is not precluded from modifying that award if there is a substantial change in circumstances.

An award of maintenance is always reviewable and modifiable under section 510(a) of the Act, if the requisite circumstances are met. *In re Marriage of Jones*, 187 Ill. App. 3d 206, 229, 543 N.E.2d 119, 135 (1989). In addition, where certain income is uncertain to continue, the fact of its existence in the past is something that the court can take into consideration in awarding support. *In re Marriage of Reyna*, 78 Ill. App. 3d 1010, 1014, 398 N.E.2d 641, 645 (1979). In *Reyna*, 78 Ill. App. 3d at 1014-15, 398 N.E.2d at 645, the trial court, in awarding maintenance and child support based on former husband's income, which was uncertain to remain stable, noted

that if his sources of income become unavailable in the future, he may seek a modification of his maintenance and child support obligations.

In this case, respondent has not shown why a distinction should be made between a substantial change in income and a similar change in the value of an account from which income is derived. In this case, the record indicates that petitioner's Morgan Stanley account was worth at least $200,000 at the entry of the last order, and that its value decreased to $63,000 at the time of the hearing on his motion to terminate maintenance. It is also apparent from the record that petitioner relies on that account to make his maintenance payments and for his own support. Thus, even if the value of petitioner's Morgan Stanley account may have been uncertain and subject to fluctuation, that did not preclude petitioner from seeking termination of his maintenance obligation if he could no longer rely on that account as a source of income to make those payments. Additionally, respondent's assertion that petitioner's income has increased since 1999 is misleading because, as noted above, his income consists largely of withdrawals from his retirement account.

Respondent's reliance on *In re Marriage of Waller*, 253 Ill. App. 3d 360, 362, 625 N.E.2d 363, 364-65 (1993)*, is misplaced.* In *Waller*, 253 Ill. App. 3d at 361, 625 N.E.2d at 364, the court found that the maintenance payor's retirement at age 63 was not a substantial change in circumstances that would justify termination of maintenance where he had refused employment, albeit at a lower rate of pay, and was in good health. In denying his motion to terminate maintenance, the trial court noted that while it was contemplated at the time of the judgment of dissolution that the former husband would retire, it had no provisions for reduction or termination

of maintenance. *Waller*, 253 Ill. App. 3d at 361, 625 N.E.2d at 364. It also noted that former husband lived in a house owned by his current wife and owned another house with no mortgage while the former wife had a mortgage on her condominium. *Waller*, 253 Ill. App. 3d at 361, 625 N.E.2d at 364. In affirming the trial court's denial, the reviewing court found that the former husband had not reached the customary retirement age, he was in good health, and his resignation was under his control. *Waller*, 253 Ill. App. 3d at 362, 625 N.E.2d at 365. Unlike the former husband in *Waller*, petitioner in this case is 80 years old and testified that, due to his age and health issues, he cannot go back to work. Further, although property holdings by a payor spouse, as further discussed below, are a significant factor in determining whether maintenance should be terminated, the fact that the property holdings of payor may have remained unchanged would not preclude changes in the economic circumstances of that spouse, such as changes in his income level, from triggering a right to reexamination of his maintenance obligation. Accordingly, the trial court's finding that petitioner showed a substantial change in circumstances to justify termination of respondent's maintenance was not an abuse of discretion. II. The trial court's decision to terminate maintenance

Respondent next contends that even if the trial court did not abuse its discretion in finding that petitioner showed a substantial change in circumstances, it nevertheless abused its discretion in considering that those changed circumstances were sufficient to warrant the total termination of petitioner's maintenance obligation. She contends that in deciding whether to change petitioner's maintenance obligation, the trial court should take into consideration the totality of the parties' financial circumstances. Respondent argues that the trial court did not sufficiently consider the

acute disparity in the financial circumstances of the parties as well as other relevant factors because it erroneously stated in its order that respondent has the "potential" for free housing paid by the state. Respondent also maintains that the trial court failed to take into account respondent's total indebtedness, including her large credit card debt, and the fact that she currently had to move into an inferior less expensive facility.

We note that where a party has shown a substantial change in circumstances, that allows the court to modify a maintenance award but does not require it to do so. *In re Marriage of Roach*, 245 Ill. App. 3d 742, 749, 615 N.E.2d 30, 34 (1993). A court which has found a substantial change in circumstances must then weigh the same factors it considered when making the initial award of maintenance, and may decide that a modification of maintenance is still not justified. *Roach*, 245 Ill. App. 3d at 749, 615 N.E.2d at 34. Those factors are set forth in section 504(a) of the Act and include: (1) the income and property of both parties; (2) the needs of each party; (3) the earning capacity of each party; (4) any impairment of present and future earning capacity by the party seeking maintenance; (5) the time required for the party seeking maintenance to acquire adequate education or training to find employment; (6) the standard of living established during the marriage; (7) the duration of the marriage; (8) the age and the physical and emotional condition of the parties; (9) the tax consequences of the property division; (10) the contribution and services by the party seeking maintenance; and (11) the parties' agreement on support. 750 ILCS 5/504(a) (West 2008). It is also well established that an award of maintenance is warranted when the trial court finds that the spouse seeking maintenance lacks sufficient property to provide for her reasonable needs and is unable to support herself, or is

No. 1-10-1452

otherwise without sufficient income. *In re Marriage of Vernon*, 253 Ill. App. 3d 783, 787, 625 N.E.2d 823, 826 (1993).

One of the salient factors upon which the trial court relied in terminating maintenance was the assumed fact that respondent would potentially be eligible to receive public welfare assistance so as to enable her to live in an assisted living facility. This factor was specifically articulated in the trial court's order. Neither of the parties nor the court has introduced any authority to permit a court to rely upon the receipt of public welfare benefits as a substitute for spousal maintenance. In perspective, such reliance would allow a spouse to use public welfare as a substitute or supplement to his own spousal obligation and to the recipient's spousal entitlement. While we have found a dearth of authority on this subject in Illinois, other jurisdictions have addressed this question as to and disallow the use of public welfare entitlements as a substitute for a spouse's maintenance obligations. See *Remick v. Remick*, 456 A.2d 163, 167-68, 310 Pa. Super. 23, 32-33 (1983); *Safford v. Safford*, 391 N.W.2d 548, 550 (Minn. Ct. App. 1986); 27B C.J.S. *Divorce* §612 (2005).

In *Remick*, 456 A.2d at 167-68, the court explicitly rejected a former husband's contention that his former wife did not need maintenance because without those payments she would be eligible for public assistance and other social welfare. In doing so, the court noted that the purpose of temporary and permanent maintenance is to prevent a dependent spouse from becoming a public charge. *Remick*, 456 A.2d at 168. The court then held that the necessity of maintenance "should be determined without regard to whether the dependent spouse would be entitled to public assistance or other social welfare benefits absent the payment of alimony."

*Remick*, 456 A.2d at 168; accord *Safford*, 391 N.W.2d at 550. In that case, the court noted that the payor spouse "argued that spousal maintenance should be denied because under welfare rules, she should receive more money from general assistance medical care in Olmstead County," and found that "[t]here is no authority for this proposition, and would seemingly violate public policy." *Safford*, 391 N.W.2d at 550; see generally 27B C.J.S. *Divorce* §612, at 249 (2005), which states that "*** the necessity and amount of alimony should be determined without regard to whether the dependent spouse would be entitled to public assistance or other social welfare benefits absent payment of alimony."

In this case, respondent testified that she had been told that once the funds in her bank account are depleted, the State will pay for her housing expenses at the assisted living facility where she currently resides. The trial court stated in its order that when respondent's funds are depleted, "the State of Illinois will subsidize the cost of the facility," and that "[w]hile petitioner must pay a mortgage on his Illinois home, taxes and insurance on two homes, respondent has the potential for free housing paid by the State." Thus, the trial court abused its discretion in taking into account that respondent may be eligible for public assistance, even though it acknowledged that her eligibility was uncertain. More significantly, the trial court abused its discretion in assuming that public assistance can be a substitute for a spousal obligation.

Correspondingly, respondent also contends that while the trial court referred to the parties' assets and liabilities in its order terminating respondent's maintenance, it did not "give any weight" to those assets and liabilities, and that while respondent's circumstances have worsened since the entry of the prior court order, petitioner's circumstances have actually improved. In

support of that contention, she argues that the trial failed to consider that while respondent has extensive debt and her only asset is her bank account, petitioner owns two homes, is able to have discretionary spending and has a higher income. She maintains that petitioner's "speculations" as to the value of his residences should not have been given any weight by the trial court.

As noted above, respondent's assertion that petitioner has a higher income is misleading because petitioner's higher income consisted largely of enlarged withdrawals from his retirement account, resulting in the accelerated depletion of those funds. Consequently, less funds will remain available for further withdrawals, and at that rate of withdrawal, those funds will be exhausted within a short span of two years. However, as shall be discussed below, we conclude that the trial court should consider petitioner's property ownership in determining whether to terminate maintenance.

While the trial court properly considered petitioner's testimony in regard to the value of his residences, that property, whatever its value, is a factor to be considered in determining a maintenance award. 750 ILCS 5/504(a)(1) (West 2008). In that regard, we have previously noted that an owner is qualified to express his opinion of the value of his property by virtue of ownership. *American National Bank*, 155 Ill. App. 3d at 973, 508 N.E.2d at 1114. In this case, petitioner testified that his Wisconsin residence was valued at approximately $200,000, and he did not challenge the county tax assessor's finding that it was worth $365,000 in 2008. In addition, petitioner testified that he believed that his Illinois residence is worth $80,000, but admits that it was appraised for $170,000 in 2008. By virtue of his ownership, the trial court may take into account petitioner's belief to the value of his residences in addition to the other evidence

-22-

introduced as to the value of his two homes.

As noted above, in awarding maintenance, a court may take into account the value of a spouse's property holdings, whether consisting of real estate or chattel, to determine spousal maintenance entitlement. 750 ILCS 5/504(a)(1) (West 2008). That statutory provision explicitly mandates that the value of spouses' property holdings must be considered in determining the appropriateness of maintenance and is applicable both ways insofar as the court may take such property values into consideration in determining a spouse's obligation to pay maintenance and correspondingly, a spouse's right to receive maintenance. 750 ILCS 5/504(a)(1) (West 2008). Our Illinois decisions have been consistent in their application of that statutory provision. See *In re Marriage of Schrimpf*, 293 Ill. App. 3d 246, 249, 687 N.E.2d 171, 173 (1997) (court took into account former husband's life insurance accounts and real estate owned in denying termination of former wife's maintenance); accord *In re Marriage of Phillips*, 244 Ill. App. 3d 577, 590, 615 N.E.2d 1165, 1175 (1993) (value of former husband's company considered in determining maintenance award); see generally *In re Marriage of Miller*, 342 Ill. App. 3d 988, 989, 796 N.E.2d 135, 137 (2003) (division of marital assets and liabilities is an integral part of the decision-making in an award of maintenance); *Shive v. Shive*, 57 Ill. App. 3d 754, 763, 373 N.E.2d 557, 564 (1978) (noting that a court should consider the property of both parties in determining whether to modify an award of maintenance). Further, although an issue not injected by the parties in this case, it would further appear that considering the respective property holding for the purpose of determining a maintenance award that the court may consider such value whether the property is marital or nonmarital.

No. 1-10-1452

In *Schrimpf*, 293 Ill. App. 3d at 249, 687 N.E.2d at 173, the court affirmed the denial of a former husband's motion to terminate maintenance because aside from his pension and social security payments, he had a life insurance policy with a cash surrender value of $425,409.17, another policy with a cash surrender value of $20,851.96, as well as a lot which he and his current wife bought for $49,000. In doing so, the court noted that the former husband had the option of taking cash from his life insurance policies, even though that would decrease his survivor benefits, and also took into account the value of his real estate. *Schrimpf*, 293 Ill. App. 3d at 249-50, 687 N.E.2d at 173. Similarly, in *Phillips*, the court affirmed a maintenance award, noting that the trial court properly took into consideration the value of a corporation, which was the payor spouse's nonmarital property, in determining the appropriateness of maintenance. *Phillips*, 244 Ill. App. 3d at 589-90, 615 N.E.2d at 1174-75; see also *In re Marriage of Bryant*, 206 Ill. App. 3d 167, 171-72, 563 N.E.2d 834, 836-37 (1990) (trial court properly terminated maintenance after the payor husband lost his job, taking into account the value and income derived from his IRA). Thus, a paying spouse's separate property is a significant factor to be considered by trial courts in determining the appropriateness of a maintenance award.

In this case, while petitioner in this case has only one life insurance policy, which is worth $7,000, he owns two residences, one of which appears to be valued between $80,000 and $170,000, and another which appears to be worth between $200,000 and $365,154. Although petitioner testified that he does not intend to sell either of his two residences and that he does not know whether he owns the Illinois residence jointly with his current wife, the evidence on record suggests that he owns two separate homes and would have the option of selling at least one of

them to support himself if that became necessary. In contrast, the record indicates that respondent owns no real property and that her only asset is her Chase account, worth between $70,000 and $75,000 at the time of the hearing. Although respondent appeared to have a somewhat larger retirement account than petitioner, whose retirement account was worth $63,000, respondent does not have other assets that she may dispose of once her account is depleted, as contrasted with petitioner, who may have property valued at a total of $535,154 at its high end or $269,500 at its low end. There is nothing in the record to show that the trial court attempted to explore this disparity in the estimated value of petitioner's property to determine whether petitioner's property values should be placed at the higher end or at the lower end.

Furthermore, while petitioner has a mortgage on his Illinois house and pays $318 per month, respondent testified that she has extensive debt to several creditors. Additionally, respondent testified that she has not been making payments on those debts and that one of her creditors has garnished her bank account after receiving a judgment against her. Thus, even if respondent does not make further payments on her debts, other creditors may pursue judgments against her and garnish her bank account, thereby depleting it at a faster rate. See *Roach*, 245 Ill. App. 3d at 749, 615, N.E.2d at 34 (the trial court in ruling on a petition to modify maintenance, weigh the same factors is consider in making the original award, which include the income and property of each party, the needs of each and their present and future earning capacities); *In re Marriage of Underwood*, 314 Ill. App. 3d 325, 329, 731 N.E.2d 1003, 1006-07 (2000) (a former wife's need for maintenance increased where the former husband discharged his portion of the marital debt in bankruptcy and the former wife remained liable on her portion of that debt).

No. 1-10-1452

In this case, it is undisputed that both parties are elderly and therefore do not have any significant earning potential. Additionally, petitioner testified that pays $318 per month on the mortgage on his Illinois residence, and $3,300 in real property taxes on his Wisconsin residence. On the other hand, respondent testified to her extensive debt, and while she admitted that she has not been making payments, she averred that one of her creditors has received a judgment against her and garnished her account. Further, while her housing expenses have decreased from $4,000 to $2,000 per month, she draws about $2,700 from her Chase account each month, which would indicate a quick depletion of her retirement account. In addition, respondent testified that when her retirement account is depleted, her only source of income will be her social security benefits of $734 per month. Thus, if the trial court finds that respondent is unable to meet her reasonable needs, it may deny petitioner's motion to terminate maintenance, taking into account both parties expenses and the value of petitioner's two homes. *Vernon*, 253 Ill. App. 3d at 787, 625 N.E.2d at 826.

Respondent next contends that the trial court failed to consider the standard of living established during marriage in deciding to terminate maintenance. She maintains that the parties had a comfortable standard of living during marriage, with a primary residence and a vacation home in Wisconsin. According to respondent, evidence shows that respondent now must depend on public assistance to fund her food and housing, while petitioner has the same standard of living as he did during his marriage to respondent, since he still maintains two residences.

An award of maintenance is generally determined by the needs of the spouse seeking maintenance and the ability of the other spouse to pay, in relation to the standard of living to

which they were accustomed during marriage. *Shive*, 57 Ill. App. 3d at 760, 373 N.E.2d at 562..

Further, the resources available to former spouses dictates whether they can maintain their

lifestyle after dissolution of marriage. *In re Marriage of Swanson*, 275 Ill. App. 3d 519, 526, 656

N.E.2d 215, 220 (1995). In addition, it has been recognized that most divorced couples do not

have sufficient resources to maintain two households at the same standard of living enjoyed

during the marriage and one or both parties often must change their lifestyle. *Swanson*, 275 Ill.

App. 3d at 526, 656 N.E.2d at 220. However, even if the parties' resources are insufficient to

maintain their previous lifestyle, maintenance may still be appropriate where one spouse had

insufficient income to meet her needs. *Swanson*, 275 Ill. App. 3d at 526, 656 N.E.2d 215, 220

(citing *In re Marriage of Kristie*, 156 Ill. App. 3d 821, 823, 510 N.E.2d 14, 15 (1987)).

As noted above, petitioner testified that his standard of living has decreased, such that he

no longer belongs to clubs and has cut his extra spending. Although petitioner testified that he

and his current wife use her pension and social security benefit for her personal expenses, he also

stated that they are able to use some of her income for discretionary spending, such as gifts for

their children and grandchildren. Additionally, petitioner also testified that although he owns two

residences, he does not intend to sell either one. As discussed previously, his intent with regard

to the sale of his property is relatively immaterial, since it is not immune from the court's

consideration in determining the potential sources of funding by either party. In addition,

respondent testified that her only asset is her Chase account, and that once it is depleted, she will

have only her social security benefits of $734 per month to pay for her expenses. Thus, even if

the trial court finds that neither party has sufficient income or resources to maintain the lifestyle

enjoyed during the marriage, it should nevertheless award maintenance to respondent if it finds that she has insufficient income to sustain herself.

### III. The trial court's denial of respondent's rule to show cause

Lastly, respondent contends that the trial court's failure to find petitioner in contempt for his noncompliance with the court's orders was against the manifest weight of the evidence. She argues that the prior order from October 12, 1999, denying petitioner's petition to reduce maintenance was in effect in January, 2009, when petitioner directed his account manager to cease maintenance payments to petitioner. In addition, respondent maintains that petitioner's standard of living remained the same and that he failed to prove that there was a decrease in the value of his investment account due to the stock market decline.

It is well established that whether a party is guilty of contempt is an issue of fact for the trial court to decide, and a reviewing court will not disturb the trial court's finding unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *Logston*, 103 Ill. 2d at 286-87, 469 N.E.2d at 176. In addition, noncompliance with an order to pay maintenance constitutes *prima facie* evidence of contempt, which shifts the burden to the payor spouse to show that he is unable to pay. *Logston*, 103 Ill. 2d at 285, 469 N.E.2d at 176. In order to prevail, the payor spouse must prove that he neither has money now with which to pay, nor has he wrongfully disposed of money or assets with which he might have paid. *Logston*, 103 Ill. 2d at 285, 469 N.E.2d at 176, see also *In re Marriage of Sawyer*, 264 Ill. App. 3d 839, 849, 637 N.E.2d 559, 565-66 (1994) (finding that husband was unable to pay his support obligation where his income amounted to $253 a week after garnishment by the IRS and, therefore, was not in

contempt for nonpayment was not against manifest weight of the evidence).

In this case, having determined to remand this matter for reexamination of the maintenance award, we correspondingly remand this matter to the trial court to reexamine the determination of whether petitioner's conduct would warrant a finding of contempt. Without attempting to preempt this matter from the trial court's reexamination, we note that based upon the record before us, we have no reason to believe that petitioner wrongfully disposed of assets or that petitioner acted in bad faith in stopping payments, since he may have shared the trial court's view, albeit erroneous, that his real estate holdings did not have to be considered in his ability to meet his maintenance obligations.

For the foregoing reasons, we reverse the judgment of the trial court and remand this matter for the court to reconsider the entitlement of the respondent to reconsider its judgment award with regard to the charge of contempt against petitioner and with respect to the entitlement of respondent to continued maintenance, taking full account of the value of petitioner's property, including his real estate, and the needs of respondent without regard to her potential receipt of public welfare assistance to meet her needs, residential or otherwise.

Reversed in part and remanded.