2022 IL App (1st) 210324-U

FIFTH DIVISION
May 13, 2022

No. 1-21-0324

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| In re the Marriage of: | ) | |
| | ) | |
| LAURA MOSTOFI, | ) | Appeal from the |
| | ) | Circuit Court of Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | 16 D 230465 |
| v. | ) | |
| | ) | Honorable Robert Johnson, |
| C. JOHN MOSTOFI, | ) | Judge Presiding. |
| | ) | |
| Respondent-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

*Held:* The trial court did not abuse its discretion in denying respondent's motion to modify his maintenance obligation to his former wife; affirmed.

¶ 1 This appeal stems from the trial court's order denying respondent C. John Mostofi's motion to modify his monthly maintenance obligation to his former wife, petitioner Laura Mostofi. John contends on appeal the trial court abused its discretion when it denied his motion where: (1) it misinterpreted the parties' marital settlement agreement (MSA); (2) it found that

John's annual income did not fall below $1.2 million; and (3) it found that John did not establish a substantial change in circumstances. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     Laura and John were married on September 2, 2000. The parties have two children, both of whom were in high school at the time of the hearing on John's motion to modify maintenance. Laura filed her petition for dissolution of marriage on October 19, 2016. On August 24, 2017, the trial court entered a judgment for dissolution of marriage, dissolving the parties' 16-year marriage. The judgment incorporated the parties' MSA. Article II of the MSA states:

> "2.1 Employment Status: JOHN is presently employed by Bank of America. The parties agree that JOHN will pay maintenance to LAURA as set forth below.
>
> ***
>
> 2.3 *Maintenance to LAURA*. JOHN shall pay non-reviewable maintenance to LAURA for a fixed period of 10 years as follows:
>
>> (a) Commencing on September 1, 2017, JOHN shall pay LAURA monthly maintenance in the amount of $35,750 for a fixed period of 10 years at which time JOHN's obligation to pay maintenance to LAURA shall automatically terminate, unless maintenance is terminated earlier as set forth below.
>>
>> ***
>>
>> (d) *Termination*. JOHN's obligation for maintenance shall automatically terminate upon the first to occur of the following events:
>>
>>> (i) LAURA's Death;
>>>
>>> (ii) JOHN's Death;

(iii) LAURA's remarriage;

(iv) LAURA's cohabitation with another individual on a conjugal and regular basis; or

(v) On the tenth (10th) anniversary of the entry of the Judgment for Dissolution of Marriage.

(e) *Modifiability*. The amount of JOHN's non-reviewable maintenance payments shall be modifiable only upon a substantial change in circumstances via proper notice, petition and hearing. However, the parties agree that the following shall not constitute a substantial change in circumstances for modification purposes: (1) the emancipation of either child; (2) Any increase in JOHN's income. JOHN represents that his current income is $1.2 million. In the event that JOHN's income drops below this amount, JOHN may petition the Court for a reduction in the amount of his maintenance payments."

¶ 4     On February 13, 2020, John filed a motion to modify maintenance. In his motion, he alleged that a "substantial change in circumstances has occurred, specifically that John's income will drop below the $1.2 million amount in 2020." John requested a reduction in maintenance consistent with the reduction in his income. He also stated that he "tried to resolve this matter directly with Laura, but with no success thus far."

¶ 5     On March 16, 2020, Laura filed her response stating that there had been no reduction in John's income as contemplated by the MSA. She further stated that John tried to discuss a reduction in maintenance payments in February 2019 and November 2019, and that in both instances, Laura requested documents confirming a reduction in John's income. She stated that

the only documents produced did not support John's assertion that his income had dropped below $1.2 million.

¶ 6      On July 23, 2020, while that motion was still pending, Laura filed a motion for John to seek employment. In John's response to Laura's motion to seek employment, John stated that although his departure from Bank of America was deemed "voluntary," he had worked at the company since 1989, and it "was a technicality for John's benefit."

¶ 7      On October 14, 2020, Laura filed a petition for rule to show cause and other relief relating to John's maintenance obligation including verification of a life insurance policy. She stated that John's motion to modify maintenance was filed on February 13, 2020, which was before he voluntarily ended his employment. John had not paid maintenance since July 2020. Laura alleged that on September 11, 2020, the court had addressed John's failure to pay, and had ordered John to recommence payments, but no payments had been forthcoming. Laura alleged that John had recently purchased a $600,000 boat, which was made after the motion to modify maintenance was filed.

¶ 8      In response to Laura's petition for rule to show cause, John stated in part that he was only a partner in the yacht and was only responsible for a fraction of the purchase cost. He stated that he gave copies of his life insurance policy to Laura on October 19, 2020, and that he was now current on his payments to Laura.

¶ 9      On January 26, 2021, a hearing was held via video conference on John's motion to modify maintenance that had been filed on February 13, 2020. John's counsel stated in opening remarks that John had learned that his bonus, which was part of his annual compensation structure, was going to be reduced dramatically. Subsequently, in March 2020, John received a call which forced him to resign, which would leave him with some benefits. Since then, he has

been unsuccessful in securing a new job. Laura's counsel argued that John left his employment voluntarily and not in good faith.

¶ 10    John testified that he was 55 years old and had worked at Bank of America since July 3, 1989. At the time of his divorce from Laura, he was the head of commercial regional credit for North America. The MSA indicated that if his income dropped below $1.2 million, he would have the ability to seek modification to the monthly maintenance amount he owed to Laura. According to the MSA, John owed Laura $35,750 per month for 10 years. John testified that he pays for all private school expenses for his son, and that his daughter goes to public school.

¶ 11    John was shown his 2017 Individual U.S. Income Tax Return, which showed an adjusted gross annual income of $2,200,912. John testified that at the end of 2017, toward Thanksgiving, Bank of America "replaced me with a gentleman from New York." John stated that he was given a new position, on the coverage side of the business instead of the credit side. John was "titled as an executive vice-chairman." Compensation was not discussed at that time, but his base salary remained the same in 2018 and 2019, which was $350,000 a year. He also continued to receive additional compensation in the form of bonuses and stock. John's net income in 2019 was over $1.2 million.

¶ 12    John testified that in 2020, he still had the same base income, but he learned his bonus was going to be $100,000, which was lower than in the past, and which would bring his net income under $1.2 million. On February 13, 2020, John filed his petition to modify his maintenance obligation.

¶ 13    John testified that in March 2020, he received a call from Alastair Borthwick, the head of banking. The week after that conversation, John left the bank.

¶ 14    John further testified that he lived at 9 West Walton in Chicago. According to his financial affidavit, John paid $8,996 a month on his mortgage for that property, and $15,875 a month for household expenses. John testified that he thought property taxes were around $3,500 a month, and assessments were also around $3,500 a month.

¶ 15    John's W-2 statement from 2020 reflected that his income was $709,999.37. His base salary was still $350,000 per year going into 2020, but he only worked the first quarter of 2020. Had he continued working for the bank throughout 2020, he would have had a gross income of $972,000, which would still have been under $1.2 million.

¶ 16    John testified that he did not get anything in writing that he was fired because he chose the option to resign and keep his reputation intact. He would also still be entitled to the accrued benefits, including deferred compensation, pension, and "various different insurance benefits for the children."

¶ 17    John stated that since March 2020, he has had three conversations with headhunters, but remains unemployed. He accepted a role on the board of directors for a company headquartered in Las Vegas with operations in Chicago that comes with a stipend of "either 60,000 or 100,000 a year." He was currently "getting checks for 5,000 a month." He was able to keep restricted stock that vests out over three years, so in 2021, he was expecting to receive "about 200,000 and some change." John testified that he would make about $300,000 in 2021 without being employed by Bank of America.

¶ 18    John further testified that after he left Bank of America, he paid for 50 percent of a boat that cost $600,000. John stated it was "basically a brand new boat that had never been used," and he thought that the price was worth significantly more than the purchase price.

¶ 19   On cross-examination, John testified that his last formal day of work for Bank of America was March 31, 2020. The cost associated with keeping the new boat in Burnham Harbor was "somewhere between $6,000 or $7,000 would be my guess, and we split all the costs." He had paid for a captain before and there were storage fees in the winter, which amounted to $6,000 or $7,000.

¶ 20   John testified that he also has investment income, and he received dividends and interest income in regards to his brokerage accounts. He also has interest in real estate property.

¶ 21   Laura testified next. She testified that she was self-employed as a travel agent. In 2020, she had made $8,000 by mid-March, and was set to make another $25,000 to $30,000 when the pandemic hit. There were no additional bookings for 2020. She had been facilitating e-learning with her children, one of whom was diagnosed with ADHD. The money that John paid her each month met her expenses and allowed her to save some money.

¶ 22   Laura was working full time up until their first child was born in 2003, at which point she went to part-time work. She stopped working part-time in 2010 because she and John had agreed they did not want a nanny raising their children. Laura started her business in May 2016, and the divorce occurred in 2017. She decided to be a travel agent because she enjoyed the work and it allowed her to be home in the morning to get her children to school and be back at the end of the day when they got home. She could help them with homework and make dinner. She could work at 10 p.m. after the children had gone to bed.

¶ 23   Laura testified that the children were with her most of the time but would go into Chicago and spend a night with John "maybe once a month." In the earlier years it was a bit more often, "maybe twice a month," but it was "never the full weekend." She received the Wilmette residence as part of the settlement, and she planned to live there with the children indefinitely.

¶ 24    Laura stated that John first came to her in November 2018 regarding modification of his maintenance payments. He called her and said he thought his salary was going down, so he wanted to have an agreement with her where he would just pay her a percentage of his income. Laura told him to contact her attorney. There was no agreement reached at that time. John reached out again in November 2019 and said his salary was going to "fall below this level, you need to agree to this." She again told him to talk to the attorneys. Laura testified that John "made a comment that he would quit his job and I'd get nothing if that's what he had to do."

¶ 25    Laura stated that there was a letter from Bank of America, dated September 14, 2018, in the packet of pension plan information that John had turned over to her in discovery. The letter was admitted into evidence and stated in part: "As you requested, we have estimated your benefits payable from the pension plan. This estimate is based on certain assumptions and information we have in our records." It stated that the earliest commencement date of his pension plan was February 1, 2021. That letter was dated shortly before John first reached out to Laura about modification of the maintenance in November 2018.

¶ 26    Laura stated that John paid his maintenance through July 2020, and then stopped paying. Laura sent him a text asking about it and his response was, "no, payment is not likely; I'm not making any money so you're not getting any either." She then filed a petition for rule to show cause for his failure to pay. The petition was set for hearing in November 2020, but John paid her on November 2, 2020.

¶ 27    In closing, John's counsel asked that the statutory formula be used to figure out the new maintenance amount Laura would receive "until at such time as he becomes re-employed earning more income in which case [Laura] can petition the Court at that time."

¶ 28    Laura's counsel argued that the evidence showed that John left Bank of America voluntarily. She stated that the one piece of evidence presented that supported John's contention that he was forced out is John's testimony and the "hearsay evidence of a phone call from someone who we never heard from." She argued that it was John's burden to show that he left his employment in good faith and that it was not voluntary, and he failed to do that except through his own self-serving testimony.

¶ 29    On February 25, 2021, the court issued a written order denying John's petition to modify maintenance. It found that John failed to provide evidence that his total income for 2020 from all sources fell below $1.2 million. His income during 2020 met or exceeded an average rate of $1.2 million per year through August 2020, in that his March 31, 2020, paystub showed income of $732,061. John's additional income from 2020 had not been presented. The court found that John failed to present any corroborative evidence that his resignation was involuntary, and since his resignation, John had continued to enjoy the same standard of living and discretionary spending as preceding his resignation. The court further found that John failed to demonstrate a good-faith effort to seek new employment commensurate with his education, qualifications, and earning potential. The court did not find John's testimony regarding the facts and circumstances of his resignation from Bank of America to be credible. Finally, the court found that John failed to meet his burden to show that a substantial change in circumstances occurred in that he failed to provide credible evidence that his resignation of employment was involuntary or in good faith. John now appeals.

¶ 30                                      II. ANALYSIS

¶ 31    On appeal, John contends that the trial court abused its discretion in denying his motion where: (1) it misinterpreted the parties' MSA; (2) it found that John's annual income did not fall

below $1.2 million; and (3) it found that John did not establish a substantial change in circumstances. Laura maintains that the trial court correctly denied John's petition to modify maintenance.

¶ 32    Maintenance may be modified by a court pursuant to section 510(a-5) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510(a-5) (West 2020)). A "substantial change in circumstances" as required under section 510(a-5) means that either the needs of the spouse receiving maintenance or the ability of the other spouse to pay that maintenance has changed. *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 198 (2011). The party seeking modification bears the burden of establishing a substantial change of circumstances. *Id.*

¶ 33    Section 510(a-5) sets forth the specific factors to consider in determining a motion to modify maintenance:

"(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage ***;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage; and

(9) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/510 (a-5) (West 2020).

¶ 34     In addition, in determining whether and to what degree a maintenance award shall be modified, the court should also consider the same factors assessed in determining the initial award found in section 504(a) of the Act. *Blum v. Koster*, 235 Ill. 2d 21, 30-31 (2009); 750 ILCS 5/504(a) (West 2020). Those factors are:

"(1) the income and property of each party, including marital property apportioned and nonmarital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment.

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2020).

¶ 35    A trial court's ruling on a petition for modification of maintenance will not be reversed absent an abuse of discretion. *In re Marriage of Virdi*, 2014 IL App (3d) 130561 ¶ 26. "Under the abuse of discretion standard, the question is not whether this court might have decided the issue differently, but whether any reasonable person could have taken the position adopted by the trial court." *In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 708 (2006). "[W]hen the basis

12

for an award of maintenance is established in the record, it is not mandatory that the trial court make explicit findings for each of the statutory factors." *Blum*, 235 Ill. 2d at 38.

¶ 36 Here, section 2.3(e) of the MSA states that the amount of John's "non-reviewable payments shall be modifiable only upon a substantial change in circumstances via proper notice, petition and hearing." It further states that the parties agreed that the following "shall not" constitute a substantial change in circumstances for modification purposes: (1) the emancipation of either child; (2) Any increase in John's income. It also states that in the event that John's income drops below $1.2 million, John "may petition the Court for a reduction in the amount of his maintenance payments."

¶ 37 John petitioned the court in February 2020 to modify maintenance because he believed he would be getting a smaller bonus than usual, bringing his income under $1.2 million. Shortly thereafter, he stopped working for Bank of America altogether. Under the MSA, John was permitted to petition the court to reduce his maintenance when he believed his income was going to fall under $1.2 million. The MSA did not provide, however, that if John's income fell below $1.2 million, he would automatically be entitled to a reduction of maintenance. Rather, it merely provided John "may" petition the court for a reduction of maintenance at that time, and that his maintenance was "modifiable" upon a showing of a substantial change in circumstances. The question now becomes whether the trial court, after considering the relevant statutory factors, abused its discretion in denying John's petition to modify his maintenance to Laura. We find that it did not.

¶ 38 The first statutory factor the court is directed to consider is "any change in the employment status of either party and whether the change has been made in good faith." 750 ICLS 5/510(a-5)(1) (West 2020)). Laura testified at the hearing that John received a letter from

13

Bank of America dated September 14, 2018, which stated: "As you requested, we have estimated your benefits payable from the pension plan," and noted that the earliest commencement date of his pension plan was February 1, 2021. A month later, John reached out to her about reducing his maintenance payments. He reached out again in 2019, and then again in 2020. He eventually stopped paying maintenance until Laura filed a petition for rule to show cause, at which point he resumed paying maintenance.

¶ 39    John's final day of work for Bank of America was March 31, 2020. John testified that he had a conversation with Bank of America, which led him to believe he was forced to resign. However, there were no documents presented indicating that Bank of America had forced John to resign, and there was no testimony presented to corroborate John's testimony regarding the alleged conversation with Bank of America. The trial court found that John's testimony regarding the circumstances of his resignation was not credible, and that he failed to meet his burden where he failed to provide credible evidence that his resignation of employment was involuntary or in good faith. We highlight that the trier of fact is charged with assessing the credibility of the testimony at trial. *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 69. "A reviewing court will defer to the trial court's findings because the trial court, 'by virtue of its ability to actually observe the conduct and demeanor of witnesses, is in the best position to assess their credibility.' " *In re Marriage of Manker*, 375 Ill. App. 3d 465, 477 (2007) (quoting *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 980 (2006)). Accordingly, we will not disturb the trial court's finding that John's testimony regarding the voluntariness of his resignation was not credible.

¶ 40    Another factor the court was to consider was any property acquired after the entry of judgment of dissolution of marriage. 750 ILCS 5/510(a-5)(8) (West 2020). Evidence was

14

presented that after John petitioned the court to modify his maintenance payments, he purchased half of a $600,000 boat. John testified that the costs for keeping a boat in the harbor were around $7,000, and the costs for storing the boat also amounted to about $7,000.

¶ 41    Finally, we note that it was John's burden to show that a substantial change in circumstances occurred. *In re Marriage of Logston*, 103 Ill. 2d 266, 287 (1984) (the party seeking modification of a maintenance order has the burden of showing that a substantial change in circumstances has occurred). Courts in Illinois have held that "substantial change in circumstances" as required under section 510 of the Act means that either the needs of the spouse receiving maintenance or the ability of the other spouse to pay that maintenance has changed. *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 198 (2011).

¶ 42    Here, the evidence showed that John's final paystub indicated that he had made $732,061 by March 31, 2020. John's 2020 W-2 statement showed that John earned wages of $709,999.37. While John acknowledged he had additional sources of income, evidence of that income was not presented at trial. He testified that he: (1) had investment income, where he received dividends and interest income in regards to his brokerage accounts; (2) had interest in several investment properties; (3) accepted a role on the board of directors for a company that came with a stipend of "either $60,000 or $100,000"; and (4) was able to keep restricted stock and was expected to receive "about $200,000 and some change." The trial court's finding that John failed to present all of his income from 2020 to the court, and therefore failed to show that his income was below $1.2 million was therefore not against the manifest weight of the evidence. *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 233 (2008) (a trial court's factual conclusions will be affirmed by a reviewing court unless against the manifest weight of the evidence).

¶ 43    Additionally, after John supposedly was forced to resign, he purchased a boat that came with costs to keep in a harbor and store during the winter, did not make any significant changes to his lifestyle, and only had three conversations with headhunters since his final day of work for Bank of America. We find that a reasonable person could have found that John failed to meet his burden of showing that his ability to pay that maintenance to Laura had changed. Accordingly, we find that the trial court did not abuse its discretion in denying John's petition to modify maintenance. *In re Marriage of Samardzija*, 365 Ill. App. 3d at 708.

¶ 44                                III. CONCLUSION

¶ 45    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 46    Affirmed.