2020 IL App (1st) 190357-U

FOURTH DIVISION
March 31, 2020

No. 1-19-0357

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JESSE VINER, | ) | Cook County |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | No. 07 D 230321 |
| and | ) | |
| | ) | |
| RENA VINER, | ) | Honorable |
| | ) | Debra Walker, |
| | ) | Judge Presiding. |
| Respondent-Appellee. | ) | |
| | ) | |

JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Affirming the judgment of the circuit court of Cook County modifying the former wife's permanent maintenance where she demonstrated a significant change in her reasonable needs as required by section 510 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/510 (West 2016)).

¶ 2   Petitioner, Jesse Viner, appeals an order of the circuit court of Cook County modifying

the maintenance awarded to respondent, Rena Viner, from $10,000 per month to $17,300 per

month. On appeal, Jesse maintains that the trial court abused its discretion increasing Rena's maintenance award to $17,300 per month as the evidence established at trial contradicted the court's findings. Specifically, Jesse argues that the trial court: (1) improperly relied solely on his increased income to modify Rena's maintenance award where she failed to demonstrate a substantial change in circumstances; (2) improperly found the amount of maintenance originally awarded to Rena was inadequate; (3) failed to consider the effect of the Tax Reform Act of 2018 or to set forth a specific amount for Rena's taxes; (4) improperly increased the amount of Rena's maintenance based on an unsubstantiated rate of inflation; and (5) failed to consider Rena's dating relationship as a source of income for Rena. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3                                    BACKGROUND

¶ 4      We begin by observing that while the record in this matter is voluminous, the actual issues presented are narrow. Accordingly, we set forth only those facts pertinent to the disposition of this appeal.

¶ 5      After 34 years of marriage, on June 29, 2007, Jesse filed a petition for dissolution of marriage. On November 8, 2008, the trial court entered a judgment of dissolution of marriage that incorporated the parties' marital settlement agreement. That agreement awarded Rena permanent maintenance, allocated the parties' marital property, and included specific provisions regarding the terms of sale of the former marital residence.

¶ 6      Pursuant to article II of the marital settlement agreement, Rena was awarded permanent maintenance in the initial amount of $11,350 per month commencing November 2008 until such time as the marital residence was sold, at which point the amount of Rena's maintenance would decrease to $10,000 per month. The maintenance amounts paid by Jesse were taxable to Rena

and deductible by Jesse. Rena's maintenance award was also subject to the occurrence of statutory termination events such as either of the parties' deaths, Rena's remarriage, or Rena's cohabitation with another person on a "resident, continuing conjugal basis."

¶ 7 The martial estate was distributed as follows: The parties equally divided their retirement savings. Rena received 55% of the remaining marital estate comprised of $200,000 from a Wachovia account and $450,000 as a buyout of her interest in Jesse's company, Yellowbrick Group (Yellowbrick), a professional services corporation providing mental health services to teens and young adults. Jesse received 45% of the marital estate, which included 100% of his interest in Yellowbrick.

¶ 8 On May 12, 2016, Rena filed a motion to modify maintenance pursuant to section 510 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510 (West 2016)), seeking an upward modification of her maintenance based on a substantial change in circumstances since the entry of the judgment of dissolution. Specifically, Rena maintained that she experienced a significant increase in her living expenses and that Jesse's income had substantially increased since the entry of the judgment of dissolution.

¶ 9 Subsequently, Jesse filed a petition to terminate maintenance claiming that Rena purportedly was engaging in "conjugal cohabitation on a resident, continuing basis with Mr. Terry Gold."

¶ 10 Over the course of eight days in fall 2018, the trial court conducted an evidentiary hearing on Rena's motion to modify maintenance and Jesse's petition to terminate maintenance. Rena, Jesse, and Terry were the only witnesses. Numerous financial documents, including bank statements, tax filings, and financial affidavits from both parties were admitted into evidence in support of the testimony presented.

¶ 11    Rena testified that she was 67 years old at the time of the evidentiary hearing. She received her doctorate in counseling psychology in 1988 but was never professionally licensed as a psychologist. Three children (now adults) were born to her marriage with Jesse and she worked as a homemaker during the marriage. In 1992 she commenced working at a treatment center performing family assessments, but only remained there for 18 months. She then worked part-time for Jesse at some point in the 1990s for less than a year. In 2006, Jesse asked her to work at Yellowbrick as an executive vice president. In April 2007, she was fired. She has not worked a full-time job on a consistent basis since.

¶ 12    Regarding her standard of living, Rena testified as follows. For 30 years of their marriage, Jesse and Rena owned and resided in a 4,500 square foot six-bedroom, three-bathroom home in Glencoe, Illinois. She currently rents a two-bedroom apartment in Highland Park, Illinois. During each winter break the family would travel for one to two weeks. They went five times to Hawaii, and once to Belize, Costa Rica, Argentina, Paris, London, Acapulco, the Cayman Islands, and Florida. On spring break, they traveled to Prague, Amsterdam, London, and Argentina. They also owned two timeshares where they would travel to go skiing. They would take 10-day long summer vacations to various destinations which included two trips to Israel. When traveling, the family would stay in hotels like the Fairmont or Four Seasons or they would rent a condominium.

¶ 13    During the marriage, Rena would drive a Lexus or an Audi. Jesse would drive either a Mercedes or Lexus. Rena would shop at department stores like Bloomingdale's or Nordstrom. She would wear designer brands like Eileen Fisher, Lafayette, and Armani. Jesse would wear Armani suits. Rena testified she currently leases a similar luxury vehicle and shops at the same stores as she did when she was married.

¶ 14    Rena testified that she filed the petition for modification of maintenance because she was tapping into her savings too much and she was concerned that she would not have enough money.  Specifically, Rena testified that she inherited $200,000 from her mother's estate in April 2016 and had to use a majority of those funds to cover her living expenses.  Rena further testified that she had not accounted for certain expenses at the time she signed the martial settlement agreement, her taxes increased, and everything became more expensive.

¶ 15    Rena further testified to her extensive health issues.  According to Rena she was regularly seen by numerous physicians for her various medical conditions including an internist, a dermatologist, an allergist, an otolaryngologist, an immunologist, a cardiologist, a gastroenterologist, a rheumatologist, an orthopedic surgeon, a podiatrist, a urologist, an oncologist, a pulmonologist, a gynecologist, an oral surgeon, a psychiatrist, and a chiropractor.  Rena also had knee replacement surgery in October 2018 and she testified that she would be in need of physical therapy that was not covered by Medicare.  Rena further testified that in the last nine months she spent $1400 out of pocket on her medications.  According to Rena she pays $544 per month for Medicare parts A, B & D as well as a supplemental Blue Cross Blue Shield plan.  She further testified she does not have dental or optical insurance and had been saving funds to pay for some necessary major dental work.

¶ 16    According to Rena's financial affidavit of April 2018, she had a savings account with $34,640, a Merrill Lynch investment account with a balance of $473,767, and a Schwab investment account with a balance of $104,446.  Rena testified, however, that those amounts have since decreased due to market conditions.  In addition, Rena's financial affidavit indicated she had the following retirement benefit accounts:  Schwab Roth individual retirement account ($10,764); Merrill Lynch individual retirement account ($936,995); and a Merrill Lynch

inherited individual retirement account ($136,232).

¶ 17    Rena's financial affidavit set forth $15,365 in itemized monthly living expenses.  During the evidentiary hearing Rena testified that since she created the financial affidavit certain expenses had increased: rent from $4298 to $4375; cell phone from $127 to $135; storage fees from $214 to $219; automobile payment from $469 to $562; and parking from $135 to $145.

¶ 18    Rena further testified that her taxes would increase in 2018 to approximately $2208 per month.  Rena supported this testimony with her 2017 tax returns as well as a statement from her accountant regarding the impact the Tax Reform Act of 2018 would have on her tax liabilities.  These documents were admitted into evidence via stipulation between the parties.  According to the 2017 federal tax returns and the accompanying documents prepared by Rena's accountant, Rena's federal tax liability would increase from $14,612 in 2017 to $26,500 in 2018.

¶ 19    Aside from the maintenance she received, Rena testified her monthly income was $2,347, including social security, investment income from savings that was reinvested, and mandatory distributions from an IRA she inherited from her mother.  Rena further testified that she utilized credit card points to obtain free flights and hotel stays.

¶ 20    Terry Gold testified that at the time of the hearing he was 69 years old.  He has been dating Rena since late 2012 after being set up with her on a blind date.  According to Terry, in the beginning of their relationship he paid when they would go on dates.  However, as their dating relationship continued, he and Rena would take turns paying when they went out.  Regarding vacations, Terry testified that when he and Rena traveled together they would split the costs.  For example, he would pay for the air fare and she would pay for the hotel.  Terry further testified that he resided in his own home, he did not keep any belongings at her home, he would spend the night at Rena's approximately once per week, he would see Rena three to six times a

week, he did not consistently spend major holidays with Rena, and they did not share any financial accounts.

¶ 21     Jesse, who was 67 at the time of the evidentiary hearing, testified as follows.  At the time of the divorce, he was making approximately $300,000 per year as the CEO and chief medical officer of Yellowbrick.  Over the last three years, his income from Yellowbrick averaged $3 million and he continues to work 60-70 hours per week.  Jesse's financial affidavit indicated he had total assets of $14.75 million and a total net worth of $9.35 million.  While Jesse testified regarding numerous debts (a majority attributable to his ownership of Yellowbrick), he did indicate that he had approximately $700,000 in discretionary income each year.  Jesse further testified that since the judgment of dissolution, he has purchased a $1.6 million home in Evanston, Illinois and a $3.8 million condominium in Bal Harbour, Florida.  While Jesse testified similarly to Rena regarding the vacations the family took and the automobiles they drove, he classified their lifestyle as "conservative" in relation to other families in their neighborhood.

¶ 22     After considering the testimony and evidence presented, the trial court denied Jesse's motion to terminate maintenance finding that Jesse did not meet his burden to establish that Rena and Terry were engaged in a *de facto* marriage.  In a subsequent written order, the trial court granted Rena's motion to modify her permanent maintenance.  In so deciding, the trial court found that Rena testified in a "pleasant, straight-forward, and honest manner" and that she "had a good grasp of the voluminous documents and exhibited a good memory."  In regard to Jesse, the trial court found he "appeared to be pleasant and quite intelligent" and that "he seemed credible at times but did not have the same mastery of the facts as Rena."  The trial court then considered the evidence presented and weighed the numerous factors set forth in section 510(a-5) of the Act.  The trial court found that Jesse remained employed at Yellowbrick, as he was at the time of the

divorce; however, his income had dramatically increased since that time. Over the last three years, Jesse has had an average adjusted gross income of over $2.8 million annually. Rena, however, remained unemployed and dependent upon maintenance and assets to meet her reasonable needs.

¶ 23    Regarding the efforts, if any, made by Rena to become self-supporting, the trial court found that the permanent maintenance awarded in November 2008 was appropriate given the long duration of the marriage, Rena's contributions during the marriage, her lack of skills and experience, her health considerations, and Jesse's ability to pay maintenance. The trial court further found it was "inappropriate to think that she could have become self-supporting at that time, much less now, ten years later, when Rena is 67 years of age and has a myriad of health concerns, including arthritis already necessitating one knee replacement, high blood pressure and cholesterol, severe reflux disease, a lumbar protruding disc, skin cancer, hematuria, and mental health issues."

¶ 24    As to any impairment of the present and future earning capacity of either party, the trial court found that Rena's health conditions, age, and lack of work experience have significantly impaired her ability to earn income now and in the future. Jesse, however, "has never made as much income in his life as he is making now" and there is no evidence that he suffers any impairment to his present or future earning capacity.

¶ 25    In considering the tax consequences of the maintenance payments upon the respective economic circumstances of the parties, the trial court found that Rena's maintenance will remain taxable and that evidence was presented that her 2018 quarterly tax payments nearly doubled from what they were in 2017.

¶ 26    Regarding the duration of the maintenance payments previously paid (and remaining to

be paid) relative to the length of the marriage, the trial court found that permanent maintenance remained appropriate where "[i]t would be inequitable to now penalize [Rena] for the sacrifices she made throughout the marriage on behalf of the family."

¶ 27    The trial court next considered the property, including retirement benefits awarded to each party under the judgment of dissolution of marriage and the present status of the property. The trial court found that at the time of the divorce, the parties equally divided their retirement savings and Rena received 55% of the rest of the estate (essentially $200,000 in cash – a substantial portion of which went to pay her attorney fees – and $450,000 paid over time). Jesse received Yellowbrick and its related entities, presumably worth approximately $530,000 at the time of the judgment of dissolution. Since that time, Jesse's net worth has grown to over $7 million (not including retirement), which does not include a value for Yellowbrick. Jesse's financial affidavit of July 28, 2017, lists total assets of $14.75 million and total net worth of $9.35 million. In contrast, even including the inheritance from her mother, Rena's net worth is less than $600,000 (not including retirement funds). The trial court further found that "[a]bsent the inheritance she received with approximately $100,000 having already been spent to cover living expenses and another $100,000 retained as part of her net worth, she would be much worse off."

¶ 28    The trial court further considered the increase or decrease in each party's income since the prior judgment. The trial court found that Jesse's income had increased by more than 400% since the entry of the judgment, while Rena had been living on the same amount of maintenance ($11,350 initially and then $10,000 per month in September 2017). The trial court also noted Jesse's financial statement of July 28, 2017, indicated that his total income is $3.73 million with total expenditures of $2.887 million, not including his maintenance payments. The trial court

concluded that "Jesse has much available net cash each month compared to Rena's monthly shortfall. He testified that he has in excess of $700,000 income over expenses annually."

¶ 29    Lastly, the trial court considered the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage. The trial court found that Rena is in the same position she was at the time of the divorce and that she has had to use assets including part of her inheritance to meet the shortfall between her maintenance and monthly living expenses. The trial court observed that "[b]ut for that inheritance from her mother's estate, Rena would be in a worse position." In contrast, Jesse's net worth has grown over 1,000% including millions of dollars in investments and savings, a $1.6 million home in Evanston, and a $3.8 million condo in Bal Harbour, Florida.

¶ 30    The trial court based this conclusion on the financial evidence presented at the evidentiary hearing. The trial court calculated that Rena's monthly income (outside of her maintenance) was $2,347, which included social security, investment income, and mandatory individual retirement account distributions. The trial court found that Rena's reasonable monthly living expenses total $15,106, which includes her $236 Medicare supplement but excludes her income taxes. In reaching this number, the trial court adjusted certain items as they appeared in Rena's financial affidavit: rent to $4,375, cell phone to $135, storage fees to $219, automobile payment to $562, parking to $145, dental/orthodontia to $492, optical to $74, medicine to $155, and life/long term health insurance to $953. The court further exercised its discretion and adjusted moving expenses to $50 (an occasional, not annual, expense); furnishings to $300 (as the amount listed was excessive and unreasonable); and clothing to $1000 (as the amount listed was excessive and unreasonable). The trial court also observed, "Interestingly, if one examines Rena's claimed living expenses in June 2008 (just prior to the divorce) and subtracts the

expenses for [her] daughter *** her expenses were $13,191. If one now accounts for inflation over the past 10 years, the sum of $15,106 is logical."

¶ 31    In response to Jesse's argument that Rena's prior living expenses could not have been so high because maintenance was previously set at $11,350 which was automatically adjusted down to $10,000 after the sale of the marital residence, the trial court observed that Rena "testified that she thought she needed to agree to less maintenance in order to get divorced from Jesse." The court further noted that this amount was agreed to by the parties in the marital settlement agreement. However, "[n]ow that this matter has been litigated and evidence adduced, it is clear to this Court that Rena agreed to an original maintenance amount that was inadequate. During this evidentiary hearing, this Court heard Rena testify on multiple occasions that she has been depleting her savings in order to maintain her standard of living." The court noted that Rena testified she was using money from her inheritance to pay bills and that when her mortgage payment and taxes increased she had to pay by withdrawing funds from her savings account.

¶ 32    The trial court also addressed Jesse's argument that he and Rena had a "modest and conservative lifestyle during their marriage" such that Rena does not need that much maintenance to maintain her marital standard of living. The trial court disagreed and found this argument was belied by the testimony. The trial court pointed out that for the last 20 years of their marriage, the parties owned and resided in a very large home in Glencoe consisting of 4500 square feet with six bedrooms and three bathrooms. In contrast, Rena is now renting a two-bedroom apartment with a small den in Highland Park which is half the size of her marital home. The court also observed that the parties took numerous international vacations, shopped at expensive boutiques, and that Jesse purchased expensive jewelry for Rena. Accordingly, the trial court found that Rena was not currently living beyond the lifestyle established during the

marriage. To account for her payment of income taxes, the trial court ordered Jesse to pay Rena an increased maintenance of $17,300 per month. Thereafter, Jesse filed this appeal.

¶ 33                                          ANALYSIS

¶ 34    On appeal, Jesse maintains that the trial court abused its discretion increasing Rena's maintenance award to $17,300 per month as the evidence established at trial contradicted the court's findings. Specifically, Jesse argues that the trial court: (1) improperly relied solely on his increased income to modify Rena's maintenance award where she failed to demonstrate a substantial change in circumstances; (2) improperly found the amount of maintenance originally awarded to Rena was inadequate; (3) failed to consider the effect of the Tax Reform Act of 2018 or to set forth a specific amount for Rena's taxes; (4) improperly increased the amount of Rena's maintenance based on an unsubstantiated rate of inflation; and (5) failed to consider Rena and Terry's dating relationship as a source of income for Rena. We will address each contention in turn.

¶ 35    Maintenance may be modified or terminated by a court pursuant to section 510(a-5) of the Act (750 ILCS 5/510(a-5) (West 2016)) only upon a showing of a "substantial change in circumstances." A "substantial change in circumstances" as required under section 510(a-5) means that either the needs of the spouse receiving maintenance or the ability of the other spouse to pay that maintenance has changed. *Shen v. Shen*, 2015 IL App (1st) 130733, ¶ 132. It is well settled that the party seeking modification of maintenance has the burden of establishing that a substantial change in circumstances has occurred. *In re Marriage of Bernay*, 2017 IL App (2d) 160583, ¶ 14; *Shen*, 2015 IL App (1st) 130733, ¶ 132. "Trial judges cannot gaze into a crystal ball and foresee what the future holds for the parties. This explains why permanent maintenance is always modifiable or terminable should there occur a substantial change in circumstances."

1-19-0357

*Shen*, 2015 IL App (1st) 130733, ¶ 87.

¶ 36    In determining whether to modify or terminate a maintenance award, a court considers the nine factors set forth in section 510(a-5) of the Act (750 ILCS 5/510(a-5) (West 2016)). Those factors are:

"(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage *** and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage ***; and

(9) any other factor that the court expressly finds to be just and equitable." *Id.*

¶ 37    Section 510(a-5) further instructs that the court shall consider the applicable factors in section 504(a) of the Act (750 ILCS 5/504(a) (West 2016)). 750 ILCS 5/510(a-5) (West 2016). The section 504(a) factors are:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or any parental responsibility arrangements and its effect on the party seeking employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences of the property division upon the respective economic circumstances of the parties;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2016).

No single factor is determinative in considering the duration and amount of maintenance and the trial court is not limited to reviewing the factors outlined in the statute. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 651 (2008).

¶ 38 A trial court's decision to modify or terminate a maintenance award will not be disturbed on appeal absent a clear abuse of discretion. *Id.* at 650; *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 199 (2011). An abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the court. *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 93.

¶ 39 In the present case we find that the trial court properly exercised its discretion in concluding that both Rena's reasonable needs and Jesse's ability to pay had increased since the 2008 judgment of dissolution of marriage. At the evidentiary hearing on the petition for modification, Rena testified that her necessary living expenses had increased substantially since the 2008 judgment of dissolution. In support of her claim, Rena presented a financial affidavit which consisted of an itemized list of her monthly living expenses totaling $15,365.92. Rena also testified that certain of these expenses had increased since the financial affidavit was created. Namely, these increases involved her rent from $4298 to $4375, parking from $135 to $145, onsite storage from $15 to $20, and automobile lease payment from $469.42 to $562. Rena further testified regarding an increase in her medical expenses; specifically, that she needed

increased dental and optical care and that she had spent $1400 on her medications in the last nine months.

¶ 40    Rena's financial affidavit also detailed certain deductions and expenses that were not provided for in her 2008 financial affidavit.  These included: federal tax ($2208), state tax ($542), life/long term care insurance ($1000), and individual retirement account contribution ($541.66).  Accordingly, Rena argued before the trial court that her living expenses totaled $16,128.04 and requested the court award her $20,000 to account for the taxes she would need to pay on those funds.

¶ 41    After weighing the statutory factors, the trial court declined to award her the requested amount, finding the amount Rena testified she spent on clothing, furnishings, and moving expenses to be unreasonable.  Thus, the trial court adjusted those monthly amounts to $1000 for clothing, $300 for furnishings, and $50 for moving expenses.  After considering the additional income Rena received from social security, dividends, and mandatory disbursements, as well as the effect of inflation, the trial court found Rena's monthly living expenses to be $15,106.  The trial court then increased the monthly award to $17,300 to account for Rena's payment of income taxes.  Based on the record before us, we agree with the trial court's assessment of the statutory factors and the amount of maintenance awarded.  Therefore, we do not find the trial court's award to be an abuse of discretion.

¶ 42    Jesse, however, maintains that the trial court made various factual findings that were against the manifest weight of the evidence and therefore the modification award was an abuse of discretion.  We address each of his arguments in turn.

¶ 43    We first address Jesse's argument that the trial court erred in basing Rena's maintenance increase solely on the fact his income had increased.  According to Jesse, his income is only

relevant after Rena has demonstrated a substantial change in her circumstances. He maintains that because Rena has been able to afford the marital standard of living over the last decade without incurring any debt, she is unable to establish a change in circumstances to warrant an increase in her support.

¶ 44     Jesse relies on *In re Marriage of S.D.*, 2012 IL App (1st) 101876, to support his argument. We initially observe that *S.D.* involved a general review of maintenance pursuant to the parties' martial settlement agreement, not a modification of maintenance under section 510 of the Act. *Id.* ¶ 25. As noted by the *S.D.* court, a general review of maintenance involves a different standard, namely that the petitioner is not required to prove a substantial change in circumstances in order to justify a change in the maintenance award. *Id.* Accordingly, *S.D.* is distinguishable from the case at bar in this regard.

¶ 45     Procedural posture aside, *S.D.*'s discussion of a spouse's increase in income is relevant here. In *S.D.*, the former wife argued that the former husband should contribute more to her maintenance because his income allowed him to do so and still maintain a reasonable standard of living for himself. In rendering these arguments, the former wife relied on *In re Marriage of Reynard*, 344 Ill. App. 3d 785 (2003), and *In re Marriage of Simmons*, 87 Ill. App. 3d 651 (1980). The reviewing court disagreed that these cases supported the former wife's argument that a party must pay more maintenance merely because he has the ability to do so. *S.D.*, 2012 IL App (1st) 101876, ¶ 44. The *S.D.* court observed that instead, the trial court must consider the factors outlined in section 504(a) and 510(a-5) of the Act, and "award an increase or decrease in maintenance only where 'the needs of the spouse receiving alimony change or the ability of the other spouse to pay alimony changes.' " *Id.* (quoting *Shive v. Shive*, 57 Ill. App. 3d 754, 760 (1978)). Applying this standard, the reviewing court acknowledged that the trial court found the

former wife's needs did not increase substantially, but rather decreased given the emancipation of the parties' child and that the former husband's income had decreased by 24%. *Id.* Accordingly, the reviewing court concluded that the trial court did not abuse its discretion by decreasing the former wife's maintenance to $10,000 per month. *Id.*

¶ 46    Applying the law set forth in *S.D.* to the facts of this case, as discussed above, it is apparent that Rena has demonstrated a significant change in circumstances as to warrant an increase in maintenance. While Jesse is correct that Rena did not acquire any debt since 2008, the evidence disclosed that she had to use significant amounts of the cash inheritance from her mother in order to pay her bills. Furthermore, although Jesse is correct that the amounts of certain bills decreased over time, we observe that these bills were related to the maintenance of their large marital home. It is obvious to this court that the amount Rena would need to spend to clean her apartment and to pay the utility bills related to that apartment would be significantly less than those associated with a six-bedroom single family home. In addition, we are obliged to acknowledge that a decade has passed since the marital settlement agreement was entered. Over those ten years, Rena has developed significant health challenges which required her to see over a dozen different physicians. While she is now on Medicare (which has decreased the amount she pays for health insurance), she is still responsible for out of pocket expenses (such as physical therapy, medications, and dental work) and in need of other conveniences to maintain her standard of living. Moreover, as set forth in more detail below, Rena has also demonstrated a substantial change in the amount of taxes she is required to pay. While Jesse is correct that "[t]he law does not require a party to pay more maintenance merely because he or she can do so" (*In re Marriage of Brunke*, 2019 IL App (2d) 190201, ¶ 63), it is readily apparent that the trial court did not solely increase Rena's maintenance based on Jesse's substantial income but due to

a substantial change in her reasonable needs. Accordingly, based on the record before us, we cannot say that the trial court abused its discretion when it increased Rena's maintenance.

¶ 47    Jesse next takes issue with "the trial court's finding that the original maintenance awarded to Rena years previously in a marital settlement agreement was unfair and inadequate was a legally impermissible inquiry or conclusion." Jesse asserts that it was improper for the trial court "to go behind the [marital settlement agreement] and accept Rena's testimony that she felt forced to compromise and accept an under payment of maintenance." Jesse concludes that the trial court gave this improper finding great weight when deciding to increase Rena's maintenance. Rena disagrees and maintains that the trial court's statements in this regard were in response to Jesse's argument that the original maintenance amount was sufficient to satisfy Rena's marital standard of living.

¶ 48    It is well-established that a proceeding to modify maintenance is not a review of the equities of the original judgment of dissolution. *Id.; Shive*, 57 Ill. App. 3d at 762. "The question presented, therefore is not whether that decree was correct when entered but whether [the petitioner's] needs and [the respondent's] ability to pay have increased since the decree." *Id.* Accordingly, a trial court is to consider only the facts that occurred since the last maintenance hearing and consider a substantial change in circumstances since that date. *Anderson*, 409 Ill. App. 3d at 198-99.

¶ 49    The trial court stated in its written order that while Rena's $10,000 monthly maintenance was agreed to in the marital settlement agreement, "Rena testified that she thought she needed to agree to less maintenance in order to get divorced from Jesse" and "[n]ow that this matter has been litigated and evidence adduced, it is clear to this Court that Rena agreed to an original maintenance amount that was inadequate." It is evident to this court that the trial court made this

statement in response to Jesse's argument that "Rena's prior living expenses could not have been that high because maintenance was previously set at $11,350 which was automatically adjusted down to $10,000 after sale of the marital residence." Moreover, the trial court's acknowledgement that Rena "agree[d] to less maintenance in order to get divorced from Jesse" was testimony elicited from Rena on cross-examination after Jesse's counsel asked her about the reasons she agreed to the original maintenance amount. As Jesse was the one who encouraged the trial court to address these arguments, he cannot now complain of error which he injected into the case. See *In re Marriage of Eastburg*, 2016 IL App (3d) 150710, ¶ 14. Indeed, our review of the record reveals that the trial court did not consider the original maintenance amount in rendering its ultimate determination, but instead focused on the evidence presented and weighed the statutory factors accordingly.

¶ 50    Jesse further contends that the trial court's finding that Rena had an increased tax burden was against the manifest weight of the evidence where the court did not consider the Tax Reform Act of 2018 and failed to indicate a specific tax amount. Rena maintains that Jesse failed to raise the argument regarding the Tax Reform Act of 2018 before the trial court and therefore maintains we should not consider it. We agree with Rena. Jesse failed to raise this argument before the trial court and therefore we find it to be forfeited on appeal. See *In re Marriage of Schneeweis*, 2016 IL App (2d) 140147, ¶ 46 (citing *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 127 (2010) ("A reviewing court will not consider arguments not presented to the trial court.")). We will, however, consider Jesse's argument that the trial court awarded an "unknown sum" to account for Rena's taxes.

¶ 51    We disagree with Jesse's assessment that the trial court awarded an "unknown sum" for Rena's taxes. The trial court was presented with testimony and evidence that Rena's estimated

2018 federal tax payment would be $26,500 or $2208 per month. When one subtracts the amount of Rena's monthly living expenses ($15,106) from the final maintenance amount awarded ($17,300) there is a difference of $2194. It is thus apparent that the $2194 accounts for the payment of Rena's federal taxes. We find no error in the trial court's failure to delineate the amount of maintenance that would go toward Rena's taxes.

¶ 52    Jesse further asserts that the trial court erred in "assuming some unsubstantiated rate of inflation as definitively increasing Rena's expenses in some unknown sum." We disagree with Jesse's argument that the trial court's consideration of inflation was improper. It is well-established that the trial court may take judicial notice of inflation. See *In re Marriage of Krupp*, 207 Ill. App. 3d 779, 794 (1990); *Shive*, 57 Ill. App. 3d at 761. In any event, the trial court did not solely increase Rena's maintenance award based on inflation, but on the evidence of a change in her reasonable needs. Indeed, the trial court did not even include inflation as a separate calculation when determining the amount of Rena's maintenance, but instead articulated each living expense, determined whether it was reasonable or not, and modified the amount accordingly. It is apparent to this court, based on the record before it, that the trial court appropriately calculated the amount of maintenance.

¶ 53    Relying on *In re Marriage of Rogers*, 213 Ill. 2d 129 (2004), and *In re Marriage of Brill*, 2017 IL App (2d) 160604, Jesse lastly contends that the trial court failed to consider the funds Terry expended while going on dates and vacations with Rena as an additional source of Rena's income. Jesse asserts that Rena has been the beneficiary of Terry's "largesse" for over seven years and that these "frequent periodic gifts" should count as income available for Rena's expenses under the Act.

¶ 54    In response, Rena argues that Jesse provides no basis to expand the application of *Rogers*

and *Brill* to a boyfriend's "largesse." Rena maintains that these authorities are inapplicable to the situation here, namely Rena's long-term boyfriend paying when they go on dates.

¶ 55    Gross income, for maintenance purposes, is defined in section 504 of the Act as "all income from all sources, within the scope of that phrase in Section 505 of this Act. 750 ILCS 5/504(b-3) (West 2016). Section 505 of the Act, which addresses child support, defines "net income" as "the total of all income from all sources," with specific deductions not at issue here. 750 ILCS 5/505(a)(3) (West 2016). In *Rogers*, our supreme court engaged in statutory interpretation of the term "net income" as it appears in section 505 of the Act. Interpreting "net income," the *Rogers* court observed that the General Assembly had adopted "an expansive definition" and that "net income" is "defined broadly to encompass 'the total of all income from all sources,' minus deductions for state and federal income tax, social security (FICA payments), mandatory retirement contributions, union dues, dependent and individual health/hospitalization insurance premiums, prior obligations of support or maintenance actually paid pursuant to court order, and expenditures for repayment of debts incurred for certain purposes." *Rogers*, 213 Ill. 2d at 136 (quoting 750 ILCS 5/505(a)(3) (West 2002)). The *Rogers* court then turned to examine the plain and ordinary meaning of the word "income": "As the word itself suggests, 'income' is simply 'something that comes in as an increment or addition ***; a gain or recurrent benefit that is usu[ally] measured in money ***: the value of goods and services received by an individual in a given period of time." *Id.* It has further been defined as " '[t]he money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts and the like.' " *Id.* at 137 (quoting Black's Law Dictionary 778 (8th ed. 2004).

¶ 56    The source of the additional income in *Rogers*, however, is significantly different from

the source of Rena's alleged "income" in this case. *Rogers* involved a determination of whether $46,000 in annual gifts the former husband received from his parents on a frequent and regular basis were to be considered as part of his income for the purposes of determining his child support obligation. *Rogers*, 213 Ill. 2d at 137. Notably, the former husband testified that the gifts and loans from his family represented a "steady source of dependable annual income" that he "has received each year over the course of his adult life." *Id.* at 134. The former husband further testified that he never had to repay any portion of those sums, nor had he been required to pay tax on them. *Id.* Similarly, *Brill* involved a determination of whether $15,349 of financial assistance the former wife received from her parents justified the reduction of the duration of her maintenance award from 270 to 96 months. *Brill*, 2017 IL App (2d) 160604, ¶ 33. Neither of these cases expressly considered the issue raised by Jesse; namely, whether the funds expended by a boyfriend when taking a former wife on a date or on a vacation should be imputed as income to the former wife.

¶ 57   Under the facts of this case, we take serious issue with Jesse's argument that Rena's dating relationship can amount to income for maintenance purposes as it inappropriately implies that she engages in such a dating relationship to receive an economic benefit. This case, however, does not provide us with the proper set of facts on which we can opine regarding whether funds expended by a paramour on a former spouse should be considered as "income" under the Act for the purpose of modifying maintenance. The evidence presented at trial demonstrated that Rena and Terry took turns paying for meals, split costs when going on vacation together, and generally did not engage in gift giving aside from an occasional birthday present. While Jesse points to a portion of Terry's testimony wherein he stated, "I generally pay when I go out on a date or have gone out on dates," we find this testimony was not specific to his

interaction with Rena. This is evidenced by the fact that, immediately following this response, Terry testified that he and Rena "generally take turns" paying for dates. Moreover, Rena clarified Terry's testimony when she testified that "[e]arly on in our dating he paid more" but as they became more comfortable with each other she began paying. According to Rena, Terry was "in shock" when she suggested she pay. She explained, "I sort of started picking up because, you know, you're talking about somebody who's 67 years old now. And he's close to 70. And we all grew up where the guy would pay. And it's a big change for me and for him." Rena did acknowledge, however, that Terry "probably pays a little bit more than I do." Terry further testified that when they went on vacations "[w]e usually split different things. Sometimes she'll pay for the hotel, I'll pay for airfare. *** I'll pay for some food. She'll pay for some food. We just kind of split it." Accordingly, where, as here, a party is involved in a social relationship with another person that involves sharing the responsibility of payment for their social outings, it cannot be said that any "income" as contemplated by the Act is generated.

¶ 58    In sum, it is evident from the record that the trial court considered and weighed all of the factors set forth in sections 510(a-5) and 504 of the Act and determined that Rena met her burden to warrant an increased modification in the permanent maintenance award. Our review of the record demonstrates that the trial court's analysis was reasonably based on the evidence presented and it did not abuse its discretion in concluding that her needs had materially changed since the initial decree. Accordingly, we affirm the judgment of the trial court.

¶ 59                          CONCLUSION

¶ 60    For the reasons stated above, the judgment of the circuit court of Cook County is affirmed.

¶ 61    Affirmed.