2023 IL App (1st) 211272-U
No. 1-21-1272

FIRST DIVISION
December 18, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | Appeal from the |
| | ) | Circuit Court of Cook County, |
| RONNA GOLDNER, n/k/a | ) | Domestic Relations Division |
| RONNA MULTACK, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | No. 2012 D 1552 |
| | ) | |
| v. | ) | |
| | ) | The Honorable |
| SHELDON GOLDNER, | ) | Regina A. Scannichio, |
| | ) | Judge Presiding. |
| Respondent-Appellee. | ) | |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the circuit court's order modifying Appellant's maintenance award. The circuit court did not abuse its discretion in finding that Appellee's retirement constituted a substantial change of circumstances warranting a review of the maintenance award amount. It further did not abuse its discretion in choosing to reduce the monthly maintenance amount after considering the needs and circumstances of both parties. We also affirm the circuit court's denial of Appellant's plea for statutory interest on Appellee's past-due life insurance reimbursements; however, we reverse the court's denial of statutory interest on his withheld maintenance payments; we find that statutory interest should have been imposed on these withheld payments. Therefore, we remand the issue to the circuit court to determine the amount of statutory interest that he owes, either on the original maintenance amount or the retroactively-modified amount.

¶ 2    In the underlying dissolution of marriage matter, Respondent-Appellee Sheldon Goldner filed a motion asking the circuit court to terminate or, in the alternative, reduce his monthly maintenance obligation to Petitioner-Appellant Ronna Multack because his retirement constituted a substantial change in circumstances warranting a review of the maintenance award. Following a five-day trial, the circuit court granted Sheldon's motion, reducing his monthly maintenance obligation from $25,000 to $4,867.01, retroactive to the filing of his motion. The court issued a 48-page order and opinion on May 4, 2021, which included a detailed examination of the evidence and arguments presented by both parties and an application of the relevant caselaw and statutory factors of the Illinois Marriage and Dissolution of Marriage Act ("Act"). The court also issued rulings on certain other matters, including granting Ronna's Third Amended Petition for Rule to Show Cause and ordering Sheldon to pay $150,877.31[1] in outstanding modified maintenance to Ronna.

¶ 3    Ronna then filed a motion to clarify the court's May 4, 2021 judgment, raising three issues: (1) that the court's opinion did not address life insurance payments identified in the parties' marital settlement agreement ("MSA") that Sheldon was supposed to pay Ronna; (2) that the opinion awarded Ronna retroactive maintenance but did not award interest at the 9% statutory rate on that retroactive maintenance or on her requested retroactive life insurance payments; and (3)  that it was unclear whether the court's award of retroactive maintenance was taxable. The circuit court issued an order on September 24, 2021 denying Ronna's request for statutory interest on both the life insurance and retroactive maintenance, and declining to modify the income tax implications of the maintenance payments. Ronna now appeals from the circuit court's May 4, 2021 and September 24, 2021 judgments.

---

[1] This figure represents 31 months of Sheldon's withheld maintenance payments, at the modified rate of $4,867.01 per month. This period covers the time between Sheldon's filing his motion and the circuit court's ruling.

¶ 4                                    BACKGROUND

¶ 5      After 45 years of marriage, Sheldon and Ronna divorced in 2014. The Judgment for Dissolution of Marriage was entered on September 8, 2014 and incorporated the parties' Marital Settlement Agreement. The terms of the MSA included: (1) Sheldon would pay spousal maintenance to Ronna in the amount of $25,000 per month; (2) Sheldon would reimburse Ronna 75% of all premium payments of a life insurance policy; (3) Ronna would receive the marital property and the responsibility for the mortgage on that property; and (4) in order to complete the division of the marital estate, Sheldon would pay Ronna an amount referred to as the marital property settlement. The parties also agreed to the division of their family business, Precious Metals Refining Services, Inc. ("PMRS"), which had a stipulated value of $6 million during the time relevant to the present appeal. Sheldon became the sole owner of PMRS, and Ronna was bought out of her interest in the company by way of monthly payments.

¶ 6      Beginning around 2016, the parties ran into disagreements regarding Sheldon's maintenance obligations. Sheldon filed multiple petitions to modify or terminate the maintenance award. In turn, Ronna filed motions to dismiss his petitions, as well as petitions for rule to show cause claiming that Sheldon had, at various points, made insufficient maintenance payments or failed to make payments altogether.

¶ 7      On October 5, 2018, Sheldon filed a successive Petition to Terminate Maintenance or, in the Alternative, to Modify Maintenance, stating that at the time of filing, he was 72 years of age, earned $49,050 gross income per month, and intended to retire in December of 2018 due to his age and a heart condition that he claimed was exacerbated by work and fatigue. He argued that his retirement constituted a substantial change in circumstances warranting a termination of his maintenance obligation or, alternatively, a substantial reduction of that obligation. In response,

Ronna argued that Sheldon had not met his burden of proof in establishing a substantial change in circumstances, challenging, among other claims, the circumstances of Sheldon's retirement and whether it genuinely constituted a substantial change in circumstances.

¶ 8      In addition to filing her opposition to Sheldon's petition, Ronna filed a third petition for rule to show cause on January 10, 2019, alleging that Sheldon had stopped making maintenance and life insurance reimbursement payments in December 2018. Ronna amended and supplemented her petition a few times prior to the court's ruling on her petition, claiming more unpaid maintenance, life insurance payments, and interest.

¶ 9                    The Court's May 4, 2021 Maintenance Modification Order

¶ 10     Over a five-day trial, the circuit court heard testimony from the parties and witnesses, including expert witnesses on both sides. The court issued its Memorandum Order and Opinion on May 4, 2021. After lengthy consideration of the evidence presented by both parties, the court found that Ronna's needs had not changed, and continued to be adequately met by the property settlement payments that Sheldon paid her pursuant to their MSA. The court also disagreed with Ronna's claim that Sheldon had not actually retired from PMRS, which she based on evidence of his continued involvement with the company. The court stated that the evidence and testimony presented was sufficiently convincing to establish that Sheldon had retired from his position at PMRS, noting specifically that: (1) he was no longer receiving wages from PMRS; (2) he had delegated his former duties to the parties' son-in-law, Jarrett Niesse, and Mark Leveillee; (3) that he had only minimal contacts with and involvement in PMRS; and (4) that the titles he continued to hold reflected merely a ceremonial "emeritus" role in the company.

¶ 11     The circuit court further found that Sheldon's retirement constituted a substantial change in circumstances warranting a review of whether a modification or termination of maintenance

was warranted. The court then engaged in a review of the statutory factors as applied to the facts in this case, and concluded that a reduction, rather than full termination, of the maintenance award was appropriate. After considering Sheldon's income and assets, Ronna's ability to meet her needs and maintain her standard of living, and other related circumstances, the court modified the maintenance award from $25,000 per month to $4,867.01 per month. The court also granted Ronna's Third Amended Petition for Rule to Show Cause, finding Sheldon in indirect civil contempt and ordering him to pay $150,877.31 in outstanding maintenance, reduced to the retroactively-applied modified amount.

¶ 12                    The Court's September 24, 2021 Order

¶ 13    On June 3, 2021, Ronna filed her Motion After Judgment to Clarify. In her motion, she asked that Sheldon pay $48,510.62 in retroactive life insurance payments that he had failed to pay in addition to the unpaid maintenance. She also asked the court to impose interest at the 9% statutory rate on Sheldon's retroactive life insurance and modified maintenance payments pursuant to 750 ILCS 5/504(b-5), and to clarify the tax implications for her on Sheldon's modified maintenance payments. Sheldon responded, arguing that the life insurance issue was moot because he had paid the past-due amounts, and was current on his monthly payments. In addition to his objections to her motion, Sheldon filed a Motion to Reconsider the court's contempt finding against him, which the court denied, and which is not at issue in this appeal.

¶ 14    Following a hearing, the circuit court issued a Memorandum Order and Opinion on September 24, 2021. The court denied Ronna's request for statutory interest on both the life insurance payments and the modified maintenance payments. As to the former, the court explained that nothing in the Act provides for imposing statutory interest on life insurance that was securing a real estate obligation, as was the case here. Regarding the modified maintenance, the court stated

that statutory interest does not accrue on a support obligation unless it "becomes due and remains unpaid." 750 ILCS 5/504(b–5) (West 2022). Because Sheldon did not know whether or how his maintenance obligation would be retroactively altered while his petition was pending, the court concluded that there was no definable amount due prior to the judgment, despite finding that he had no justification for stopping his payments of $25,000 per month. The court also determined that it would not be modifying the tax implications for either party regarding the maintenance payments.

¶ 15                                              Issues on Appeal

¶ 16     Ronna raises three primary issues on appeal: (1) whether the circuit court properly determined that Sheldon's retirement constituted a substantial change in circumstances; (2) if so, whether the circuit court abused its discretion in reducing Sheldon's monthly maintenance obligations from $25,000 to $4,867.01; and (3) whether the circuit court erred in refusing to require Sheldon to pay statutory interest on the retroactively modified maintenance payments he made to Ronna.

¶ 17                                              ANALYSIS

¶ 18                Standard of Review: Maintenance Award Modification

¶ 19     Our decision *In re Marriage of Shen* explains the considerations a court must review in determining whether a modification or termination of maintenance is warranted:

> "Maintenance may be modified or terminated by a court pursuant to section 510(a–5) of the Act only upon a showing of a "substantial change in circumstances." 750 ILCS 5/510(a–5) (West 2010). A "substantial change in circumstances" as required under section 510(a–5) means that either the needs of the spouse receiving maintenance or the ability of the other spouse to pay that maintenance has changed.
>
> * * *
>
> Section 510(a–5) of the Act sets forth these specific factors to consider in determining a motion to modify maintenance:

(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage; and

(9) any other factor that the court expressly finds to be just and equitable." *In re Marriage of Shen*¸ 2015 IL App (1st) 130733 ¶¶ 132-33 (internal citations omitted); *see also* 750 ILCS 5/510(a–5) (West 2022).

¶ 20    The party seeking modification or termination bears the burden of proving that a substantial change has occurred. *In re Marriage of Dea*, 2020 IL App (1st) 190234, ¶ 18. The court's decision to modify maintenance will not be disturbed absent a clear abuse of discretion. *Id.* An abuse of discretion occurs "when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.* The abuse of discretion standard is highly deferential to the trial court. *In re Marriage of Bostrom*, 2022 IL App (1st) 200967, ¶ 54.

¶ 21    Once a party has sufficiently demonstrated a substantial change in circumstances, the court may, but is not required to, modify a maintenance award. *In re Marriage of Anderson*, 409 Ill.App.3d 191, 203 (1st Dist. 2011). In determining whether or by how much to modify maintenance, the court weighs the same statutory factors it considered when it ordered the original

maintenance award; those factors are found in section 504(a) of the Act. *Id.* at 203-04. These

factors are:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;
(2) the needs of each party;
(3) the realistic present and future earning capacity of each party;
(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;
(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;
(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;
(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;
(7) the standard of living established during the marriage;
(8) the duration of the marriage;
(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;
(10) all sources of public and private income including, without limitation, disability and retirement income;
(11) the tax consequences to each party;
(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;
(13) any valid agreement of the parties; and
(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2022).

An upward modification of maintenance is also warranted if the court finds that the party seeking

maintenance lacks sufficient property to provide for their reasonable needs or is otherwise without

sufficient income. *Anderson*, 409 Ill.App.3d at 204.

¶ 22    While the trial court should make specific findings pursuant to the above factors, it is not

required to lay out explicit findings per factor when entering a ruling under the Act. *Blum v. Koster*,

235 Ill.2d 21, 37-38 (2009) (quoting *In re Marriage of Connors*, 303 Ill.App.3d 219, 230 (2d Dist.

1999)). The decision to modify a maintenance award is within the trial court's discretion. *Bostrom*, 2022 IL App (1st) 200967 at ¶ 39.

¶ 23                    The Court's Finding of Substantial Change in Circumstances

¶ 24    As the circuit court noted in its decision, retirement does not inherently justify a maintenance modification or termination. We explained in *In re Marriage of Waller* that,

> "[w]hether a spouse may rely on his retirement as a change in circumstances to justify the modification of maintenance depends upon the circumstances of each individual case. Relevant factors include his age, health, motives and timing of retirement, ability to pay maintenance after retirement, and the former spouse's ability to provide for herself."

*In re Marriage of Waller*, 253 Ill.App.3d 360, 365 (1st Dist. 1993). Under the facts in *Waller*, we determined that the then-63-year-old respondent's retirement did not constitute a significant change in circumstances where: (1) he retired before reaching the customary retirement age; (2) he was in good health; and (3) he had been offered another position by his employer and declined it. *Id.* at 362; *see also Shen*, 2015 IL App (1st) 130733 at ¶ 145 (When determining a party's motivations in seeking modification of maintenance, the court should consider whether the party's situation is necessary or incurred by choice.)

¶ 25    In contrast, the circuit court here noted that Sheldon was 72 and past the customary retirement age, and, while he had not been specifically instructed by a doctor to stop working, he did have a heart condition that would be exacerbated by work. The court did find that the timing of his retirement could appear suspect given that he filed his petition indicating his intent to retire soon shortly after the court ruled in Ronna's favor on her Second Petition for Indirect Civil Contempt. However, the court weighed the competing evidence and determined that Sheldon's proffered explanation for why he had chosen to retire was nonetheless credible. The court also found that Ronna's needs had not changed, and that they continued to be sufficiently met by Sheldon's property settlement payments alone.

¶ 26    The court also contrasted the facts and outcome in *Waller* with *Anderson*, where we also distinguished *Waller* in noting that the 80-year-old payor in *Anderson* was above the customary retirement age and that he testified that he was unable to return to work due to health issues and his age. *Anderson*, 409 Ill.App.3d at 203. We further found that the fact that he still had assets in the form of property holdings did not preclude a determination that his economic situation had sufficiently changed to trigger a reexamination of maintenance. *Id.*

¶ 27    On appeal, Ronna presents the evidence and arguments she put forth at trial, purporting to show that Sheldon's retirement was a fiction intended to give the appearance that he could no longer pay Ronna her full maintenance award. She cites to Niesse's and Leveille's testimonies that Sheldon maintained his titles of president and CEO of PMRS and continued to use his PMRS credit card and email address, that he still had authority to hire and fire employees, that he still did business with some of PMRS's older customers, that PMRS still paid for various insurance and other expenses of Sheldon's, and other related points that she claims show Sheldon's continued connection to and involvement in PMRS. She further references the testimony of Sheldon's accounting expert that she alleges established that Sheldon could have paid Ronna her full maintenance award out of PMRS's distributions without impeding the company's ability to maintain business operations. She points to portions of Sheldon's testimony that corroborate the aforementioned points and others. She next cites the testimony of her own accountant expert, in support of her position that PMRS maintained excessive retained earnings and that Sheldon had enough income to continue paying the maintenance award. She next argues that the record shows that Sheldon's net worth and PMRS's profits had both increased since the dissolution judgment, and any reduction in income shown by Sheldon was his own choice to reduce his income from PMRS, and that he still had the means to pay off a mortgage, pay his attorney and expert fees, and

purchase $62,000 in gold bars in 2020. She further emphasizes that Sheldon effectively "is" PMRS, and the decisions of the company should be attributed to him, as being entirely within his control. She claims that the circuit court erred in accepting his subjective announcement of retirement rather than looking at his actual ability to pay maintenance.

¶ 28    We find that the circuit court conducted a thorough review of the evidence offered by both sides—including the points that Ronna raised at trial and on appeal as discussed above—regarding the circumstances of Sheldon's retirement; we further find that the circuit court did not abuse its discretion in determining that Sheldon met his burden of establishing a substantial change of circumstances. Ronna's arguments on appeal have not demonstrated an abuse of discretion and we decline to reverse the circuit court's conclusions.

¶ 29                    The Court's Modification of the Maintenance Award

¶ 30    After determining that Sheldon's retirement was a valid basis for the court to consider modifying the maintenance award, the court found that Sheldon still had the ability to pay spousal maintenance due to his various assets, which the court listed as: his ownership of 100% of the stock of PMRS (which he stipulated to be worth $6,000,000); his substantial retirement savings; the income he received from Social Security; his ownership of Cobalt, the company that owns the office space used by PMRS; and the retention of a significant amount of working capital in PMRS, with the authority to distribute it as he chose.

¶ 31                        *a. Sheldon's business income*

¶ 32    Regarding the last of these points, the circuit court disagreed with Ronna's argument, which she raises on appeal as well, that Sheldon should be considered to have access to the full value of PMRS's distributable capital. We agree with the circuit court that it was proper to consider his authority to make these distributions in light of his fiduciary obligations to PMRS and the

business's legitimate need for working capital to continue its operations. The circuit court also considered testimony from Sheldon's expert regarding the legal and practical limitations on Sheldon's ability to declare distributions from PMRS, and found that testimony to be more convincing than that of Ronna's expert. *See In re R.G.*, 2 012 IL App (1st) 120193, ¶ 39 ("[T]he trier of fact is in the best position to weigh the credibility of experts, leaving us reluctant to second-guess the findings of the trial court in a 'battle of experts.'")

¶ 33 Ronna takes issue with the circuit court's reliance on *In re marriage of Moorthy and Arjuna*, 2015 IL App (1st) 132077, in determining whether to consider business income in analyzing Sheldon's ability to pay maintenance. According to the decision in *Moorthy*, which involved child support payments, "courts should engage in a case-by-case, fact-specific analysis to determine whether retained earnings of a corporation should be imputed to the sole or majority shareholder for purposes of calculating child support." *Id.* at ¶ 64. It went on to list relevant factors in that analysis, which include:

> "(1) the extent of the obligor's ownership share in the corporation, (2) the obligor's ability to decide whether corporate earnings should be retained or distributed, (3) the corporation's history of retained earnings and distributions, in comparison to post-divorce corporation activities, (4) whether the retained earnings are excessive, and (5) whether there is evidence that income is actually being manipulated." *Id.*

While we cautioned that heightened scrutiny should be used when the payor has the power to control distributions, we stated that this fact alone is "not dispositive of whether a subchapter S corporation's retained earnings must be included in an obligor's income when calculating child support" in light of a corporation's need to retain sufficient capital to ensure its continued existence and ability to meet ongoing business needs. *Id*. We ultimately determined that the circuit court did not err in excluding the retained earnings of the payor's corporation in making its child support calculations. *Id.* at ¶ 76.

¶ 34    Ronna argues that the court erred in relying on *Moorthy* because this ignores the definition of business income as stated in the Act, which is "gross receipts minus ordinary and necessary expenses required to carry on the trade or business." 750 ILCS 5/505(a)(3.1) (West 2022) She states that the court improperly ignored this statutory definition by excluding PMRS's retained earnings from its determination of Sheldon's income. However, Ronna's citation to the Act does not support her argument that the circuit court failed to correctly consider Sheldon's income, or that *Moorthy* or the circuit court's reliance on it deviated from the language of the Act. Indeed, the court noted that Sheldon retained 100% ownership of PMRS and was solely authorized to declare distributions; the court therefore acknowledged that it must apply a heightened degree of scrutiny in reviewing the evidence presented by both sides regarding PMRS's operational needs and retained capital. With that caution noted, the court stated that it had weighed the testimonies of both parties' accounting experts regarding Sheldon's ability to make continued distributions in the amount necessary to continue meeting his maintenance obligations in full under PMRS's then-current capital retentions and operational needs; the court found Sheldon's expert to be more credible than Ronna's. The circuit court concluded that Sheldon's expert convincingly demonstrated that PMRS did not have a history of maintaining excessive assets, or that Sheldon had otherwise been manipulating or concealing his business income to understate the amount of distributions he was able to declare.

¶ 35    We find that the circuit court's review of the evidence does not ignore the statutory definition of business income. The factors identified in *Moorthy*, which the court explicitly addressed in its opinion, do not contradict the statutory language, and Ronna does not present any support for her claim that the court's reliance on *Moorthy* came at the expense of adhering to the Act. We further find that the circuit court did not abuse its discretion in declining to impute

PMRS's retained corporate earnings to Sheldon's income for the purposes of determining his modified maintenance obligation.

¶ 36                    *b. The court's review of the statutory factors*

¶ 37    Despite his retirement, as well as the abovementioned lack of support for the position that Sheldon could declare distributions from PMRS in sufficient amount to continue making monthly maintenance payments of $25,000, the record showed that Sheldon had sufficient assets to pay Ronna some amount of maintenance. Therefore, the court determined that a reduction, rather than termination, of his maintenance obligations was the appropriate choice.

¶ 38    Referring to the factors in section 510(a-5) of the Act, the court identified various bases for continuing to award Ronna maintenance, including: the length of Sheldon and Ronna's marriage and the short period of time, relative to the length of the marriage, during which Sheldon was paying Ronna maintenance; Ronna's advanced age, medical condition, and education as they impacted her ability to be financially self-reliant (finding that it was not reasonable or feasible for her to seek employment); the terms of the parties' respective property awards according to their MSA, with Ronna receiving the former marital residence and its mortgage obligations, and Sheldon receiving his interest in PMRS and substantial retirement assets[2]; and Sheldon's $62,000 purchase of gold bars after filing his petition requesting a termination or modification of his maintenance obligations.[3]

¶ 39    The circuit court then turned to the factors listed in section 504(a) and reviewed any remaining nonduplicative points. In addressing the needs of each party, the court noted that this

---

[2] The court noted that, in addition to receiving the marital residence, Ronna received property settlement payments from Sheldon as per the MSA. However, the court determined that Sheldon, even with the continuing obligation to make these payments, still had income and assets "favorable to Ronna's such that a modification in maintenance is more appropriate than a complete termination."

[3] Regarding this purchase, the circuit court wrote that it "believe[d] Sheldon simply cannot do this while simultaneously claiming an inability to continue paying maintenance and requesting a complete termination of that obligation."

factor came out in favor of a full termination of maintenance, since Ronna's needs were adequately met through her income and the property settlement payments from Sheldon alone.[4] Regarding the parties' realistic present and future earning capacities, the court reiterated that the ages and health conditions of both parties impaired their future earning capacities, but determined that Sheldon's continued earnings of $12,000 per month in rental income from Cobalt weighed in favor of modification. Other factors included: Ronna's foregone career opportunities from being unemployed outside the home during the majority of the marriage; the fact that the parties' children all reached adulthood before the divorce and Ronna was not subject to any parental responsibility arrangements (weighing in favor of termination); and Ronna's ability to maintain the standard of living enjoyed during the marriage (also weighing in favor of termination, for the reasons mentioned previously.)

¶ 40    While acknowledging the factors that supported a full termination of maintenance, the court determined that the balance of all the factors weighed in favor of modification. Having considered Ronna's arguments on appeal, we find that she has not raised any basis for disturbing any of the circuit court's findings. Given the deference we afford the lower court in reviewing its weighing of the evidence, we see no reason to determine that it committed any error.

¶ 41    The court then provided an explanation of how it calculated the modified monthly maintenance amount. According to its order, the court applied the statutory formula to the parties' income tax returns, used the income tax conditions present in the Act before January 1, 2019 as per the terms of the parties' MSA, and excluded from Sheldon's income the retained earnings of PMRS for the reasons explained previously. After arriving at a figure representing the sum of the modified maintenance and Ronna's gross annual income, the court found that this amount would

---

[4] Nonetheless, the court emphasized that this did not excuse Sheldon's decision to cease making his required maintenance payments when he filed his petition.

not result in Ronna receiving in excess of 40% of Sheldon and Ronna's combined gross incomes, resulting in a modification compliant with section 504(b-1)(1)(A-1) of the Act. This is how the court ultimately arrived at the decision to modify Sheldon's monthly maintenance obligation from $25,000 to $4,867.01.

¶ 42     On appeal, Ronna argues that "no reasonable person" would reduce maintenance by 80% under these circumstances. In support, she reiterates her previously-discussed allegations that Sheldon's retirement is not a valid change in circumstances, that he chose to pay himself a decreased salary from PMRS to create the appearance of a reduced income, and that he has access to the full earnings of PMRS to distribute as he wished and he historically used PMRS as a "personal checkbook" for his non-business expenses. She further raises the point that a court is not required to reduce a maintenance award, even upon a showing of a substantial change in circumstances. Ronna does not provide any authority for the contention that a court may not reduce a maintenance award past a certain "reasonable" amount. Indeed, if a court is authorized to terminate a maintenance award, or, put differently, to reduce it by 100%, it can surely reduce it by 80% if the circumstances support such a reduction. As we have stated, the circuit court conducted a detailed review of each of the relevant statutory factors, weighed the evidence and testimony presented at trial, and clearly laid out its calculations to arrive at a modified maintenance award that complied with the Act. *See In re Marriage of Heroy*, 2017 IL 120205, ¶ 28 ("Because the circuit court thoroughly examined each of the applicable statutory factors for modifying a maintenance award, because there is no evidence that the circuit court made a calculation error, and because the reduction *** is well supported by the record, we conclude that the circuit court's judgment was not an abuse of discretion.") We decline to reverse the circuit court's decision based on the size of the reduction.

¶ 43 <u>Standard of Review: Denial of Statutory Interest</u>

¶ 44 Section 504(b-5) of the Act states, "Any maintenance obligation including any unallocated maintenance and child support obligation, or any portion of any support obligation, that becomes due and remains unpaid *shall* accrue simple interest as set forth in Section 505 of this Act." 750 ILCS 5/504(b-5) (West 2022) (emphasis added). In interpreting a statute, we follow the principles of statutory construction. Our primary objective is to effectuate the legislature's intent, the best indicator of which is the plain language of the statute. *In re Marriage of Rogers*, 213 Ill.2d 129, 136 (2004). When the language used in the statute is clear and unambiguous, we must give the statute effect as written, without resort to other tools of interpretation. *Id.* Because the matter of statutory interpretation presents a question of law, we review the circuit court's determination *de novo*. *Id.*

¶ 45 <u>Whether the Court Properly Denied Interest on Life Insurance Payments</u>

¶ 46 In its order, the circuit court found that Ronna had failed to provide any authority for her position that Sheldon should be required to pay statutory interest on his retroactive life insurance payments. The court explained that, pursuant to the parties' MSA, the life insurance policy in question was a security on a real estate interest relating to the parties' marital property settlement.

¶ 47 On appeal, the only support Ronna provides for her argument that the court should have imposed interest on both the retroactive life insurance and maintenance payments is section 504(b-5) and her efforts to distinguish the present case from *In re Marriage of Wojcik* (2018 IL App (1st) 170625), which the circuit court relied upon and which we discuss further below. We agree with the circuit court that section 504(b-5), as well as the relevant issue in *Wojcik*, relates to maintenance

obligations, and the matter of the retroactive life insurance payments is distinguishable. We affirm the circuit court's decision to deny Ronna interest on the retroactive life insurance payments.

¶ 48                    Whether the Court Properly Denied Interest on Maintenance

¶ 49    The circuit court relied on *In re Marriage of Wojcik* in determining that it had properly denied Ronna statutory interest. In that case, the parties' marital settlement agreement provided that the respondent would make monthly support payments for 60 months. After the 60 months had passed, the petitioner requested that the trial court extend the maintenance obligation; the court agreed, ordering that the respondent pay permanent maintenance, including retroactive maintenance plus interest dating back to when the petitioner filed her maintenance petition. *Id*. at ¶¶ 1-2. We affirmed the extension of the maintenance award, but reversed the trial court's imposition of interest on the retroactive maintenance, stating that, prior to the entry of the court's judgment, the respondent could not have known whether he would have to continue making maintenance payments, or the amount of those payments. *Id*. at ¶ 43. Referring to section 504(b-5) of the Act, we explained that the respondent was not unjustifiably withholding any known maintenance payments in the months between the filing of the petition and the court's ruling. Therefore, his "obligation did not 'become due' until the trial court entered a final order that it was due. The obligation was not 'unpaid' until the trial court set the amount and ordered that it be paid." *Id*.

¶ 50    Ronna argues that the present matter is distinguishable from *Wojcik* because in that case, the court recognized that the respondent had justifiably and in good faith ceased paying maintenance because, pursuant to the parties' marital settlement agreement, he had no obligation to do so after having made payments for the required 60 months. During the time between the *Wojcik* petitioner's filing her maintenance petition and court's order that the respondent continue

making payments, including retroactively for the aforementioned months, there was no maintenance obligation that "bec[ame] due and remain[ed] unpaid," for the reasons we stated in *Wojcik*. 750 ILCS 5/504(b-5) (West 2022); *see also Wojcik*, 2018 IL App (1st) 170625 at ¶ 43. Ronna states that here, Sheldon stopped making maintenance payments prior to the court's order decreasing his maintenance obligations, but, unlike the respondent in *Wojcik*, he remained obligated to pay maintenance in the amount of $25,000 per month until the court issued its judgment.

¶ 51    In its May 4, 2021 order, the circuit court found Sheldon to have ceased making maintenance payments as required since December 2018, and ordered him to make retroactive payments in the modified amount of $4,867.01 per missed month, up to the date of the court's ruling on Sheldon's petition to terminate or modify maintenance. The court further stated that Sheldon presented no compelling cause or justification for his failure to pay maintenance during this time, particularly in light of the fact that—as the court detailed in the same order—Sheldon continued to have significant assets at his disposal, even after his retirement. Indeed, the court noted that its decision to reduce Sheldon's maintenance obligations should not be construed as "in any way condoning the fact that Sheldon simply stopped paying when he filed the instant Petition."[5] The court also granted Ronna's Third Amended Petition for Rule to Show Cause, finding Sheldon in indirect civil contempt for his failure to pay maintenance since filing his petition.

¶ 52    While the court ordered Sheldon to pay the outstanding maintenance at the modified rate, the record reflects that Sheldon continued to owe Ronna maintenance in the sum of $25,000 per

---

[5] The record shows that Sheldon filed his petition in October of 2018, and in it, stated that he intended to retire in December 2018. Therefore, it appears that he ceased making maintenance payments upon retirement, rather than the date of filing his petition. However, the discrepancy does not impact our analysis.

month from the time that he filed his petition until the court's May 4, 2021 order. The court did not issue any rulings halting his obligation to make these payments during the pendency of his petition. While we agree with Sheldon and the circuit court that he had no prejudgment knowledge of how the court would rule on his petition, we also find no justification for his assumption that he could stop making payments until the court resolved the question of how much he actually owed during those retroactive months. Unlike the respondent in *Wojcik*¸ who was not under any maintenance obligation during the pendency of the petition, Sheldon knew that he continued to owe $25,000 per month. Even though the court did grant his petition and reduced his maintenance obligation, it did not terminate it, nor would such a ruling have excused his decision to cease making payments while the court's ruling was pending. *See In re Marriage of Schomburg and Osland*, 2016 IL App (3d) 160420, ¶ 22 (stating that a potential retroactive modification of a child support obligation did not relieve the payor of the obligation to pay the current amount while a modification petition is pending).

¶ 53    There is no question that the circuit court properly made its maintenance modification retroactive to the date that Sheldon filed his petition. *See* 750 ILCS 5/510(a) (West 2022) ([T]he provisions of any judgment respecting maintenance or support may be modified only as to installments accruing subsequent to due notice by the moving party of the filing of the motion for modification;") *see also In re Marriage of Pratt*, 2014 IL App (1st) 130465; ¶ 33. Similarly, it is clear that Sheldon did not know that he would retroactively owe $4,867.01 for each month that his petition was pending—as discussed in *Wojcik*, this modified amount was not due and owing until the court's judgment. However, he did know that he continued to owe $25,000 during this time, even if this retroactively became a different amount. As the court acknowledged, he was not excused from his then-current maintenance obligation. Furthermore, neither party has presented

any support for their respective positions on whether the statutory interest on unjustifiably-withheld maintenance remains due when the court retroactively imposes a modified maintenance award covering that same time period.

¶ 54    Therefore, we find that Sheldon owed statutory interest on his withheld maintenance, and we remand this issue to the circuit court to determine the amount of statutory interest Sheldon incurred during the months that he improperly withheld maintenance, and whether that amount is calculated from the original maintenance award, or the retroactively modified amount.

¶ 55                                    CONCLUSION

¶ 56    For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed in part and reversed and remanded in part. We affirm the circuit court's order modifying the maintenance award. We remand the matter to the circuit court to address the issue of how much statutory interest should have been imposed on Sheldon's withheld maintenance payments, specifically whether the interest rate should be applied to the original or modified monthly maintenance amounts.

¶ 57    Affirmed in part and reversed in part. Cause remanded.